Pee Cueiam,
 

 The appellants were jointly indicted to No. 519 June Sessions 1940, Allegheny County, on a charge of common law conspiracy.
 

 The indictment charged in substance that the defendants had unlawfully conspired together, and with certain other persons named, to violate the provisions of the election laws of the Commonwealth by fraudulently getting the names of the candidates of the Communist Party on the ballot for the general election to be held on November 5, 1940, by means of false swearing to affidavits to nomination papers required by said election laws and the securing of signatures of qualified electors to said nomination papers by false representations as to their contents, with the intent and design to prevent a free, fair and legal general election under the election laws of the Commonwealth. It further charged the commission by the defendants of certain unlawful overt acts done by them pursuant to said conspiracy, to wit: (1) That they had procured certain named persons to circulate said nomination papers and secure signatures to them by false and fraudulent representations: (2) that they had themselves circulated said nomination papers and procured signatures to them by false and fraudulent representations; and (3) that after the said signatures had been so fraudulently obtained, they made false affidavits to said nomination papers and falsely swore to the affidavits appended to them by law, and violated the laws of the Commonwealth governing and concerning the election of candidates for public office in these and other respects.
 

 
 *298
 
 At the same sessions true bills of indictment were returned against the appellants separately, charging each of them in the first count with perjury (Section 322 of the Penal Code of 1939, P. L. 872) in the making of the elector’s affidavit appended to said nomination paper and required by law to be made before a duly qualified officer as a prerequisite to its filing; and that each defendant had wilfully, falsely and corruptly sworn in said affidavit that the signers to said nomination paper had signed the same with full knowledge of the contents thereof, whereas, in truth and in fact, the signers to said nomination paper did not sign the same with full knowledge of its contents. The second count charged the’ defendants with having knowingly made false statements in an affidavit required to be appended to and to accompany a nomination paper by the election laws of the Commonwealth (Section 1813 of the Act of June 3, 1937, P. L. 1333), on the same facts averred in the first count. A separate indictment was returned for each nomination paper on which it was alleged the affiant had made a false affidavit, and as some .of the appellants had sworn to three or four nomination papers, sixty-nine separate true bills were returned on these charges.
 

 A number of true bills were also found charging certain of the same defendants separately with having obtained a signature to a written instrument, namely, one of said nomination papers, ,by false pretenses. As no sentence was imposed on any of these bills and no appeals were taken in those cases, they were not included in the record sent up on appeal, and our knowledge of them is confined to the opinion of the trial judge refusing motions in arrest of judgment and for a new trial.
 

 It is evident, however, that all these separate indictments related to the same matters which formed the basis of the indictment for conspiracy, and were but formal bills charging the commission of the offenses
 
 *299
 
 constituting overt acts alleged to have been done in the carrying out of that conspiracy.
 

 The indictments were tried together before Judge Graff, specially presiding. The trial lasted from September 30 to October 31, 1940, and resulted in a verdict of guilty as to all the defendants tried on the conspiracy indictment except Eva Peifer, as to whom an acquittal was directed by the court. Verdicts of not guilty were likewise directed, at the request of the district attorney, on certain of the indictments charging perjury, etc. and obtaining signatures by false pretense, for lack of sufficient evidence; and demurrers to the evidence on certain others of said indictments were sustained for the same reason. Verdicts of guilty were rendered on all the other bills.
 

 The court refused motions in arrest of judgment and for a new trial in all the cases where verdicts of guilty had been rendered, except in the conspiracy case of James Headman, who became ill in the course of the trial, and as to whom a mistrial was granted.
 

 Sentences were imposed on the conspiracy bill ranging from a fine of $100, without imprisonment, to a fine of $500 and two years imprisonment in the county workhouse; and on
 
 one
 
 perjury bill, as to each defendant, the same imprisonment, if any, was given as had been imposed on the conspiracy bill, to run concurrently with that sentence. Sentence was suspended on all the other perjury bills and on all the bills for obtaining a signature by false pretenses. Separate appeals were taken from the respective judgments.
 

 The prosecutions grew out of alleged violations of the Pennsylvania Election Code of June 3, 1937, P. L. 1333, a general act applying to all elections. Primary elections, as well as the procedure for nominating candidates by political bodies not entitled to nominate candidates at primary elections, are made by the Code an integral part of the election machinery of the Commonwealth. See
 
 United States v. Classic,
 
 313 U.
 
 *300
 
 S. 299, 61 Sup. Ct. Rep. 1031, opinion by Mr. Justice Stone, now the Chief Justice, filed May 26, 1911. The prosecutions were instituted pursuant to the presentment of an investigating grand jury, summoned by the court in consequence of widespread charges and complaints — following the publication in a newspaper of the names of the signers of the Communist Party nomination papers — that the signers had been deceived as to the object and purpose of the papers or petitions they had signed.
 

 For some years the Communist Party had been entitled to nominate its candidates for public office at the primary elections held pursuant to earlier election laws; but some time prior to 1910, its vote in the State had fallen below the percentage required to give it the right to nominate its candidates at the primary election. Accordingly it lost its status as a ‘political party’ (within the definition of that term in section 102(n) and 801 (a) and (b) of the Election Code of 1937) which nominates its candidates at the primary election, and became a ‘political body’ (as defined in said Code, sections 102(p) and 801(c)), which must nominate its candidates by ‘nomination papers,’ as provided in Article IX(b) of the Code.
 

 The term ‘nomination paper’ must not be confused with ‘nomination petition.’
 

 A nomination
 
 petition
 
 is used for the nomination of candidates of a ‘political party/ Each signer of such
 
 petition
 
 must declare therein that he is a registered and enrolled member of the party designated in such petition.
 

 On the other hand, a ‘nomination paper’ is used for the selection of its candidates for office by a ‘political body,’ which is not a ‘political party’ and not entitled to nominate its candidates at the primary election. The form is directed to be prescribed by the Secretary oif the' Commonwealth, and no other forms than the ones so prescribed may be used, (section 951(a)). The num
 
 *301
 
 ber of signers necessary in 'order to secure a place for its candidates on the ballot at the regular election is prescribed in section 951(b). Each person signing such a nomination
 
 paper
 
 must declare therein that he is a qualified elector of the state, or district, as the case may be, and add to his signature, his occupation and residence and the date of his signing. The nomination paper must also set forth the name of the political body represented by the candidates whose nomination the signer is seeking, the addresses of the proposed candidates, and the names and addresses of the committee, who are authorized to fill vacancies, if any shall occur. These provisions show that while it is not necessary that the signers of the ‘nomination paper’ be
 
 registered and enrolled members
 
 of the
 
 political body,
 
 which is seeking to put its candidates on the official ballot at the general election — for that would not be possible in cases where the political
 
 body
 
 was not a political party when the registration of voters took place — nevertheless as these signers assert in the nomination paper that they ‘represent’ the political body whose candidates they nominate for a place on the official ballot, and also assume to appoint the committee to fill vacancies on the ballot on behalf of that political body, it is certainly contemplated in the statute that they should be members, adherents or supporters of, or at least favorably disposed to, the political body which they assume to represent in the naming of its candidates
 
 [1]
 
 for office.
 

 Had the Communist Party been a ‘political party,’ within the meaning of the Election Code, nobody who was not a registered and enrolled member of that party, as well as a qualified elector, could legally have signed a ‘nomination
 
 petition’
 
 for its candidates
 
 to be voted
 
 on at the primary election; and no one but a duly
 
 *302
 
 qualified elector, who was also a registered and enrolled member of that party, could have voted at the primary election for candidates on the Communist ballot. It,certainly was not intended to put the selection of candidates of political
 
 bodies,
 
 not entitled to be political
 
 parties,
 
 in the hands of persons who were not its adherents or supporters.
 

 The Code also requires, (section 951(d)), that each separate
 
 sheet
 
 of a nomination
 
 paper
 
 shall have appended to it the affidavit of some person, not necessarily a signer, and not necessarily the same person on each sheet — so that all the signatures to
 
 all
 
 the sheets constituting the 'paper’ need not be collected or secured by the same person — setting forth, (1) that he is a qualified elector of the state or district — (2) his residence; (3)
 
 that the signers signed, the nomination paper with full knowledge of its contents;
 
 (4) that their respective residences are correctly stated; (5) that they all reside in the county named in the affidavit; (6) that each signer signed on the date set opposite his name; and (7) that to the best of affiant’s knowledge and belief, the signers are qualified electors of the state or district, as the case may be.
 

 This is the affidavit in the making of which, the Commonwealth alleged, the defendants were guilty of perjury and making a false affidavit; which charges, together with the charge of obtaining signatures to the 'paper’ by false representations or pretenses, were the overt acts resulting from the illegal combination or confederation constituting the conspiracy to violate our election laws, for which appellants were indicted to No. 519 June Sessions, 1940.
 

 The appellants contend that even if they had done everything proved on the trial against them it would not amount to interfering with a free and fair election, and would not warrant a verdict of guilty on the conspiracy charge. The Election Code of 1937 prescribed the procedure that must be followed by a political
 
 *303
 
 body to get its candidates on tbe ballot for a general or regular election. Any wilful violation of the Act is punishable as prescribed in the statute. If it amounts to perjury, it is a felony, punishable under the Criminal Code of 1939, P. L. 872, sec. 322. A conspiracy to violate its provisions is a common law misdemeanor:
 
 Com. v. McHale,
 
 97 Pa. 397. The illegal procurement of a place on the ballot for the candidates of a political body, by violating the provisions of the Election Code, is an unlawful act, which interferes with a free and fair election,
 
 (Winston v. Moore,
 
 244 Pa. 447, 457-8, 91 A. 520), and a conspiracy to secure such illegal place on the ballot, by unlawful means or methods, is punishable as a misdemeanor. And it is immaterial whether the results obtained by the conspiracy are great or little; the crime does not depend on the result. If the vote is close, a few hundred votes for candidates, who. are not rightfully entitled to a place on the ballot, may swing the election; but, in the eyes of the law, it is no less a crime if the election is a walkover. “The test is not whether precedents can be found in the books but whether they injuriously affect the public police and economy ...... The ingenuity of politicians is such that offences against the purity of elections are constantly liable to occur which are not specifically covered by (statute. It would be a reproach to the law were it powerless to punish them.” Com.
 
 v. McHale,
 
 supra, pp. 410, 411.
 

 Appellants likewise contend, with respect to the separate indictments for (1) perjury and (2) making a false affidavit on a nomination paper, that the Commonwealth should have been obliged to elect on which count it would proceed. There is no merit in the contention. Under the Criminal Code of 1860, P. L. 387, section 14, wilful and corrupt perjury was declared a misdemeanor, punishable by imprisonment at labor not exceeding seven years; but the definition of
 
 ‘perjury'
 
 was limited to a false oath or affirmation legally ad
 
 *304
 
 ministered before a committee of the legislature or in any judicial proceeding; but in the same section the wilful and corrupt making of a false oath or affirmation, in taking any oath or affirmation required by an act of assembly, was declared a misdemeanor, punishable by like imprisonment. See, however, Act of March 5, 1791, 3 Sm. L. 6, sec. 3, relating to making a false oath before a notary public. Section 1813 of the Election Code of 1937, supra, provides that “If any person shall knowingly make a false statement in any affidavit required by the provisions of this act to be appended to or to accompany a nomination petition or a nomination paper ...... he shall be guilty of a misdemeanor, and upon conviction thereof, shall be sentenced to pay a fine not exceeding $500, or to undergo imprisonment of not more than one year, or both, in the discretion of the court. The second count in the perjury indictments was based on this provision. In preparing the Criminal Code of 1939, P. L. 872, however, wilful and corrupt perjury was extended in section 322, so as to apply to the making of a false oath or affirmation in taking any oath or affirmation required by any act of assembly of the Commonwealth, and was made a
 
 felony,
 
 punishable by a fine not exceeding $3,000, or imprisonment at labor not exceeding seven years, or both, with the same disqualification' from being a witness, as appeared in the Code of 1860. As Section 951 (d) of the Election Code requires an affidavit to be appended to each
 
 sheet
 
 of á nomination paper, as hereinbefore mentioned, setting forth, inter alia, that the signers signed the paper with full knowledge of its contents, the wilful and corrupt making of a false oath or affirmation to that affidavit is now perjury. The Criminal Code of 1939, however did not specifically repeal section 1813 of the Election Code of 1937, and there is no reason why both provisions, relating as they do to the same act, may not be joined as separate counts in one indictment, just as felonious assault and
 
 *305
 
 'battery may be joined with simple assault and battery, and larceny may be joined with receiving stolen goods; with the proviso, of course, that in case of conviction, only one sentence yaay be pronounced upon it. The foregoing statement of the law is supported by the decisions of the Supreme Court in
 
 Com. v. Shutte,
 
 130 Pa. 272, 18 A. 635;
 
 Com. ex rel. Russo v. Ashe,
 
 293 Pa. 322, 324, 142 A.
 
 317; Com. ex rel. Ciampoli v. Heston,
 
 292 Pa. 501, 141 A. 287;
 
 Com. ex rel. Holinko v. Ashe,
 
 290 Pa. 534, 139 A. 197. And it makes no difference that one of the counts charges a felony and the other a misdemeanor, when the offenses are not repugnant in their nature and legal incidents, provided only one sentence is pronounced:
 
 Henwood v. Com.,
 
 52 Pa. 424. Even if there is a misjoinder, it is tolled by the pronouncement of only one sentence.
 
 Ibid.
 
 Such an indictment is not duplicitous.
 

 In order to give proper consideration to the other questions raised in these appeals it is necessary to have a fuller knowledge of the matters of fact testified to on the trial on behalf of the Commonwealth, which were evidently accepted as true by the jury.
 

 The Secretary of the Commonwealth, pursuant to the provisions of the Election Code, prepared and furnished on request the forms for nomination papers which the Code prescribed should be used to the exclusion of all others. Each ‘sheet’ of the nomination ‘paper’ was thirty-two inches long by ten inches wide, folded as legal cap paper is folded, so a® to make four pages, sixteen inches by ten inches.
 

 At the top of the first page, thus folded, immediately under the printed heading, nomination paper, there appeared in the sheets or papers produced in this case the following, the words italicized being typewritten into the printed form: “We the undersigned, all of whom are qualified electors of the
 
 State of Pennsylvania
 
 and of the
 
 Allegheny
 
 County, representing the
 
 *306
 

 Communist
 
 Party or Policy, hereby nominate the following persons, viz.”.- ■
 

 Then follow the names of the candidates, their occupation, residence, and offices for which nominated, which in 61 out of the 69 papers introduced in evidence, took up t the whole of the first page of the ‘sheet’, in naming the candidates for Auditor General, State Treasurer, President, Vice-President and Presidential Electors, offices to be voted for at said election.
 

 At the top of the second page appeared the names of the Committee to fill vacancies on the ticket whom' the
 
 signers appointed
 
 for that purpose. The rest of the' second page and all of the third page consisted of blank spaces in which 77 electors — 33 on the second page and 44 on the third page — could write their respective names, residence, occupation and the date of signing.
 

 At the top of the fourth page, which was also the back of the sheet, appeared the affidavit of the qualified elector above referred to, who swore among other things, as to the residences of the respective signers and the date of their signing the paper and “that the signers to the foregoing petition signed the same with' full knowledge of the contents thereof.” The name of each of the appellants was signed as the affiant to one or more of these sheets constituting the nomination paper, and each sheet contained the jurat of a Notary Public authenticated with his notarial seal certifying
 
 [2]
 
 that the affiant had appeared before him and had subscribed and sworn to the affidavit before him on a certain date.
 

 
 *307
 
 It is apparent that if the affiant had circulated the paper and obtained the signatures, he would have had personal knowledge of all the facts sworn to in the affidavit, except the averment that the signers were qualified electors of Pennsylvania. And as to that, he could make affidavit on knowledge and belief, and did so.
 

 The Act of Assembly and the form of the nomination paper and the affidavit to it, prepared under the act, clearly intend that the affiant shall be a person who- either circulated the paper himself or was present at its circulation and could personally make oath as to the genuineness of the signatures of the signers and the correctness of their residence and date of signing, and that the persons who signed their names to it did so with full knowledge of its contents.
 

 That the leaders of the Communist party fully understood and recognized this is shown by the letter of transmittal, (Exhibit No. 1), which accompanied the nomination papers, after they were fastened together, when they were delivered to the Secretary of the Commonwealth at Harrisburg. It was signed by Carl Reeve, who was Secretary of the Pennsylvania State Committee, Communist Party of Pennsylvania, and joined in by Nalbro Frazier, one of the defendants, who was Organization Secretary and Assistant Campaign Manager for Western Pennsylvania and by Max Weiner, who was a district secretary and is a defendant in a similar prosecution in Dauphin County.
 

 In that letter appears, inter alia, the following statement : “On behalf of the Pennsylvania State Committee of the Communist Party of Pennsylvania I am herewith delivering into your possession the nomination' papers of the Communist candidates for the offices stated below and in the numbers stated below.
 
 Every Nomination paper tears the properly filled out affidavit of the qualified elector collecting the signatures
 
 (Italics supplied.)
 

 
 *308
 
 The ‘contents’ of the nomination papers concerning which each affiant made affidavit were simple.
 
 The opening statement of the paper disclosed its purpose and contents,
 
 viz., the signers declared themselves to be qualified electors of Pennsylvania, and, that as
 
 representing the Communist Party or Policy,
 
 they nominated the persons named on the first page as the candidates of that party for the offices named.
 

 If the signers to the paper were informed of that fact, they had full knowledge of its contents. If they were not, they did not have full knowledge of its contents. And the affiants, who swore that they did, swore falsely.
 

 Some 900 persons were called as witnesses by the prosecution. Of these a number swore that they had not signed the nomination papers on which their respective names appeared as signers, nor had they authorized any one to sign for them. The overwhelming majority of the remaining witnesses — at least 95 per cent of them — testified that when they signed the paper, on which their name appeared, they were not told and did not know that it was a nomination paper for candidates of the Communist Party, and that if they had known what it really was they would not have signed it; that the Communist Party was not mentioned in connection with the paper; that they signed the paper because it had been variously represented to them by the person who was circulating it and asked them to sign it, that it was a petition to keep America out of war [a very common representation]; a petition favoring Roosevelt for a third term [a common representation to registered Democratic voters]; for improved living conditions for colored people [a common representation to negroes]; for more relief; for more W.P.A. work; to raise wages for W.P.A. workers; for better playgrounds for colored children; to get a swimming pool for negroes; to help colored people get more welfare work, etc.
 

 
 *309
 
 It is clear that if these witnesses, or any of them, Were induced to sign one of these nomination papers, on the representation of the person circulating it that it was a petition to keep America out of war, or for any other of the purposes represented as above except the true one, namely, that it was a nomination paper to put the Communist ticket on the ballot, it was a false statement and misrepresentation. It was suggested by defense counsel that many of the objects or purposes so represented to these witnesses were part of the program or platform of the Communist party; but unless those ends or purposes were stated in connection with the request that the persons interviewed should sign the paper on behalf of the Communist Party, for the purpose of nominating its candidates for office at the general election — and they all denied that any such statement was made to them — the signatures were procured by false representations; and the affiant, who swore that the signers to the petition signed the same with full knowledge of its contents, made a false affidavit. The similarity of the representations, the common appeal to different groups and classes of voters exhibit all the signs of a concerted, organized effort or campaign.
 

 Numerous assignments of error have been filed in both classes of appeals, which we shall refer to as ‘perjury’ appeals and ‘conspiracy’ appeals, respectively. Our rules prescribe that each error relied on must be
 
 specified particularly and by itself
 
 (Eule 22), and that, ordinarily, no assignment of error will be considered which is not set forth in the
 
 statement of
 
 questionsi
 
 involved
 
 (Eule 50). Eule 22 has been violated in a number of assignments, where alleged errors are included under motions for new trial or in arrest of judgment embracing numerous reasons, not stated with precision, as grounds for the motion. We shall, however, discuss the principles involved in the order following. We shall discuss those involved in the perjury
 
 *310
 
 appeals first, because they are the more numerous and because an understanding of them is necessary for a discussion of the conspiracy appeals.
 

 JOINT TRIAL
 

 Appellants complain of the consolidation of the several indictments charging the offenses of perjury and obtaining signatures by false pretenses with the joint indictment charging conspiracy, and the trial of all indictments before the same jury. It is the general rule that the consolidation of a number of bills of indictment for the trial of one or more defendants is within the discretion of the trial judge and the ruling of the court will not be reversed unless it is made clearly to appear that the rights of the defendants have been prejudiced thereby.
 
 Com. v. Cauffiel,
 
 97 Pa. Superior Ct. 202;
 
 Com. v. McCord,
 
 116 Pa. Superior Ct. 480, 486, 176 A. 834;
 
 Com. v. Quinn,
 
 144 Pa. Superior Ct. 400, 405, 19 A. 2d 526.
 

 As we have shown there was a close relationship between the substantive offenses and the conspiracy, which, we think, justified the joint trial. The Commonwealth was obliged to rely upon proof of the separate charges against appellants, evidencing a design and pattern in their conduct, to establish the conspiracy. “An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities”:
 
 Com. v. Strantz,
 
 328 Pa. 33, 195 A. 75. Where the acts of the parties indicate that they were acting in concert to a common end, the jury properly may be permitted to infer that such concerted action was the result of an agreement. The joint assent of minds necessary to establish a conspiracy may be inferred from such acts.
 
 Com. v. Rhey,
 
 140 Pa. Superior Ct. 340, 14 A. 2d 192. Proof of the specific charges against each of appellants, therefore, was competent and was essential to establish
 
 *311
 
 the conspiracy. In general, defendants charged with conspiracy should be tried together.
 
 Com. v. Hartman,
 
 31 Pa. Superior Ct. 364. And it is also the usual approved practice to consolidate indictments, charging separate offenses committed by one or more of the parties, in consummation of the agreement, with the general charge of conspiracy.
 
 Com. v. Cauffiel,
 
 supra;
 
 Com. v. Faulknier,
 
 89 Pa. Superior Ct. 454;
 
 Com. v. Sonis & Sonis,
 
 81 Pa. Superior Ct. 205. There is good reason for the rule. As applied to these cases, to have granted separate trials would have entailed a repetition of the same testimony, imposing upon the Commonwealth a heavy and unnecessary burden of expense and duplication of effort.
 

 The jury upon sufficient evidence found that appellants’ acts, collectively, amounted to conspiracy and these acts, therefore, must be regarded as having been committed in furtherance of the illegal combination. Though appellants were separately indicted, there was such relationship among them, established by the conviction of conspiracy, that each appellant might have been charged with the illegal acts of all. When a conspiracy, is shown, the acts of any conspirator done in its prosecution and furtherance are admissible against any or all of the conspirators. “The least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all. No principle of law is more firmly established than that when two, or more persons conspire or combine with one another to commit any unlawful act, each is criminally responsible for the acts of his associate or confederate committed in furtherance of the common design. In contemplation of law the act of one is the act of all”:
 
 Com. v. Strantz,
 
 supra. The separate indictments, therefore, did not charge offenses which were distinct, in the sense of being unrelated.
 

 Appellants’ rights were not invaded by the consolidation and, at worst, they were only put to a tactical dis
 
 *312
 
 advantage. The number of the defendants and the multiplicity of the charges do not affect this conclusion. In reality the separate indictments collectively charged but two offenses; namely, perjury and false pretenses. Undoubtedly it Avas difficult for the jury to remember accurately all of the testimony bearing upon each count of every indictment and to keep it separately in mind and to apply it to the appropriate charge. But the record indicates an orderly presentation of the Commonwealth’s evidence and a marshaling of the testimony. As the trial of the substantive offenses proceeded the jury were informed in advance of the particular charge to which the testimony was to be applied and it was limited in its scope to the single defendant involved. It may be assumed that the jury in each instance arrived at a just verdict based exclusively upon the testimony applicable to the charge. We think it clear, therefore, that appellants were not prejudiced by a joint trial. A valid defense, by any defendant, to the substantive charges, would have worked his acquittal of the conspiracy as well.
 

 Special Grand Jury Investigation
 

 The questions raised concerning the propriety of the court’s ordering a special grand jury investigation and the conduct of the same, as bearing on the trial now under consideration, are disposed of adversely to appellants in the recent opinions in
 
 Com. v. Brownmiller,
 
 141 Pa. Superior Ct. 107, 14 A. 2d 907;
 
 Com. v. Kirk et al.,
 
 141 Pa. Superior Ct. 123, 14 A. 2d 914, affirmed, 340 Pa. 346, 17 A. 2d 195;
 
 McNair’s Petition,
 
 324 Pa. 48, 187 A. 498;
 
 Com. v. Brownmiller,
 
 137 Pa. Superior Ct. 261, 267, 9 A. 2d 155, 158, and the cases cited in them. The offenses charged dealt with matters of a grave public nature of importance to the well-being of the Commonwealth. They were peculiarly proper for investigation by a special grand jury and for the pre
 
 *313
 
 sentation by tbe district attorney of bills of indictment as directed by the grand jury.
 

 Number of Challenges
 

 'The court allowed the defendants, together, eight peremptory challenges, but stated to defendants’ counsel that if someone was called as juror whom they did not want, if they would “come up here and talk to me about it, I might be inclined to allow you to excuse the juror, because I want to assure ybu that you have a fair and satisfactory trial.” No request to challenge any juror, beyond the eight peremptory challenges allowed was made by defendants’ counsel, but they claimed the right to have six peremptory challenges for each of the thirty-one defendants in the conspiracy charge, eight challenges for each defendant in each of the sixty-seven perjury indictments and six challenges for each of the thirteen defendants in the false pretense charges, a total of 800 peremptory challenges.
 

 As to the conspiracy charge, the defendants were together entitled to only six peremptory challenges, under section 40 of the Act of March 31,1860, P. L. 427, and the Act of July 9, 1901, P. L. 629, 19 PS §811. The former Act provides that “in all cases of joint trials, the accused shall have the right to the same number of peremptory challenges to which
 
 either
 
 would be entitled if
 
 separately
 
 tried, and no more.” (Italics supplied). See
 
 Com. v. Deutsch, 72
 
 Pa. Superior Ct. 298, 308, 309, where seven defendants were jointly indicted and tried for conspiracy to prevent a free and fair election, and with conspiracy to violate the provisions of the Act of February 15,1906, P. L. 19, known as the Shern Act. By reason of the joinder for trial of the perjury cases with the conspiracy case, the number of challenges was increased to eight, pursuant to the Act of July 9, 1901, P. L. 629, 19 PS §811. In
 
 Com. v. Peronace,
 
 328 Pa. 86, 195 A. 57, it was held that, under this act, the defendant was not entitled to more
 
 *314
 
 than eight challenges, even though he was tried on more than one indictment at the same time. If the joinder of the cases on the trial was proper, as we have held it was, then the peremptory challenges were properly limited to eight on each side. As no request was made, pursuant to the suggestion of the court, for any challenges for cause which were not allowed, we are of opinion that, in any event, no harm was done defendants by the ruling. There is no
 
 constitutional
 
 right to
 
 any
 
 peremptory challenges. It is legislative in origin and is subject to change or even abrogation by the legislature, so long as it does not deny the accused a trial by jury “as heretofore”. Defendants were entitled to a trial by a fair and impartial jury, but not to a trial by any particular juror or jurors.
 

 Charge of the Court
 

 Appellants complain that the charge of the court was inadequate and insufficient because, they aver, the evidence was discussed by the court with reference to the number of the particular nomination paper involved rather than the number of the indictment. As before pointed out each indictment for perjury was based on the affidavit accompanying a single nomination paper or sheet. In presenting the testimony for the Commonwealth’s case the district attorney first informed the jury as to the name of the particular defendant to be affected by the testimony, the charge or indictment to which the testimony would apply, the number of the particular nomination paper or sheet involved, and its number as an exhibit in the trial. As the indictments for perjury were practically identical, except as to the names of the defendants, the simplest way of linking up the testimony with the indictment was by reference to the nomination paper which was the basis for that indictment. In its charge to the jury the court followed exactly the same order that the district attorney had used. It named the particular defendant, the charge
 
 *315
 
 or charges against him, and the particular nomination paper or papers, by number, to which, it was alleged, he had made a false affidavit, and it reviewed the evidence given as to the signing of that paper. That it did not in every case also identify each particular indictment by number, did the defendants no harm. All the indictments and all the nomination papers were sent out with the jury, and the issue of fact before the jury Avas the representation which had .been made to the witnesses who had signed that particular paper, and the affidavit of the defendant as to their knowledge of its contents. The court called the jury’s attention to the indictments, and the nomination paper on which each indictment Avas based, as follows: “Now, members of the jury, it has taken me a long time, but I regard that it was necessary to go over these various petitions and indictments and these different cases for you, to refer to them and also to refer briefly to the testimony supporting the different charges, offered by the Commonwealth, and also the defense offered in each particular case by the defendants. Now, there are a number of perjury charges against a number of these defendants. I am going to send these indictments out Avith you so that you will have the indictments, and they are
 
 put together
 
 in the manner,
 
 in the order,
 
 I have presented them to you, and you will also have the petitions Avith you — the various petitions that are in evidence — to help you remember the testimony here, because you will have to remember it in passing upon it, the testimony of the Commonwealth and the defense, and I tried to do this in a logical Avay so that you will remember the testimony; but, you will have these indictments with you and you take these indictments up one at a time.
 
 You will find on each indictment a reference ttí a particular petition.
 
 You take these, together with the other exhibits, and your memory of the testimony, and rely on that. I have simply attempted to outline the various,
 
 *316
 
 issues contained in the seventy indictments against the various defendants.” (Italics supplied).
 

 'The assignment of error governing this question is overruled.
 

 Defendants’ Knowledge of Falsity of Affidavit
 

 The appellants contend that the convictions of (1) perjury and (2) knowingly making a false statement in an affidavit, cannot stand because of lack of proof of the defendants’ knowledge of the falsity of the statement. The evidence on this point must be considered under two headings: First, with respect to those nomination papers in which the defendant, who made the affidavit, took a direct part in obtaining the signatures to it, or was present with the person who secured the signatures, by representing it to be something other than what it was. Secondly, with respect to the great majority of the papers, where the affidavit was made by ■one who had not circulated the paper nor been present when the signatures were obtained and had no personal knowledge on the subject.
 

 As to the first class, there was produced on the trial clear, positive and direct testimony that the defendant, who made the affidavit to a certain nomination paper knew the falsity of the statements contained in the affidavit; that certain signatures to it had been ob-; tained by him (or her), or by some .one in his presence, misrepresenting the contents of the paper. A review of the evidence shows that included in this class were:
 
 Samuel Antico,
 
 indictment No.
 
 595; Ida Blakey,
 
 indictment No.
 
 593;
 
 Lloyd Brown, No. 597;
 
 Ben Careathers,
 
 Nos.
 
 527
 
 and 533;
 
 James H. Dolson,
 
 No.
 
 538; John Derkacz,
 
 No.
 
 537;
 
 Charles Gwynn, No. 566;
 
 Rebecca Horowitz,
 
 No.
 
 559; Daniel Lepo,
 
 No.
 
 562;
 
 Andrew Novak, No. 583; Joan Powers, No. 550; Michael Stanovich, Nos. 506 and 528;
 
 Harry Steinberg,
 
 Nos.
 
 530
 
 and 605. Of these, the eight indictments underscored or italicized represent indictments on which
 
 *317
 
 sentence was pronounced, and from which, appeals were taken. As to the other indictments included in this list, sentence was suspended. It was not shown that these affiants obtained all of the signatures on these particular papers. Indeed, it appeared from the testimony that the great bulk of the signatures to them had been obtained by persons who had not sworn to the sheets or papers circulated by them, but had made affidavit to other papers, which they had not circulated.
 

 The second class includes the great majority of the defendants and of the indictments on which they were found guilty; and the question is whether one who makes oath to the truth of statements 'contained in an affidavit required by law, of which he assumes to have knowledge, when he has no knowledge whatever, can be found guilty of wilful and corrupt perjury or making a false affidavit when the falsity of the statement thus sworn to by him is proved. On this, the law of this State is clear. As early as 1814, it was held in the case of
 
 Com. v. Cornish,
 
 6 Binney 249, (Tilghman, C. J.), that one who swears wilfully and deliberately to a matter of which he has no knowledge, and which is false, is guilty of perjury. This ruling has been approved in
 
 Brooks v. Olmstead,
 
 17 Pa. 24, 29; and
 
 Page v. Allen,
 
 58 Pa. 338, 352; and followed in
 
 Com. v. McCue,
 
 46 Pa. Superior Ct. 416, 419 (Porter, J.), and
 
 Com. v. Shields,
 
 50 Pa. Superior Ct. 1, 15 (Rice, P. J.). Nor was the affiant relieved of the charge because the notary public, instead of swearing him in the words of the affidavit, may have put it in the form, “You swear that the facts set forth in this affidavit are true
 
 to the best of yowr knowledge and belief.”
 
 See
 
 Com. v. Shields,
 
 supra, p. 14. The law placed the duty of making this affidavit on some one who was sufficiently familiar with the facts connected with the obtaining of the signatures to be able to swear that those who signed the paper did so with full knowledge of its contents; and if one having no knowledge of the facts, recklessly assumes to swear
 
 *318
 
 to the truth of what is proved to have been false, he is guilty of wilful and corrupt perjury.
 

 The circumstances proved were such as to justify the inference that these affidavits were intentionally made by persons who had no knowledge of how the signatures were obtained and whether the signers were truthfully informed of the contents of the paper, in order that those who had circulated the papers and made the representations on which the signatures were obtained, would not have to make the affidavits and thus lay themselves open to prosecution for perjury and making a false affidavit.
 

 Only three of the defendants testified as witnesses on the trial, Nalbro Frazier, Logan Burkhart and Joseph Filner, the last named a candidate for Congress in the 32d Congressional District. They all admitted making the affidavits purporting to be made by them. Frazier had not circulated any of these nomination papers, or been present when the signatures were obtained. His name was signed to the letter of transmittal, which accompanied the nomination papers when delivered at Harrisburg, which contained the statement, “Every nomination paper bears the properly filled out affidavit of the qualified elector collecting the signatures.” Yet he made affidavit to three nomination papers, Nos. 188, 150 and 183, (indictments Nos. 542, 540 and 541). He admitted he had no personal knowledge concerning the signatures on these papers, he could not tell who circulated any of them, except No. 188, which he said was circulated by Ben Findley, but was not sworn to by him as the qualified elector who collected the signatures. Logan Burkhart circulated some petitions and secured about 200 signers, but he did not make affidavit to those petitions. He made affidavit to three petitions, Nos. 1150,1147 and 1149 (indictments Nos. 523, 524 and 526). He thought he had collaborated in circulating No. 1147 (indictment No. 524) on which he was not sentenced, but had not collected the signatures for Nos.
 
 *319
 
 1149 and 1150 (indictments Nos. 523 and 526) and did not know who had, but made tbe affidavit at tbe request of Ben Findley, candidate for Congress. Joseph Filner circulated several papers and secured about 200 to 250 signatures, but he made no affidavit to the papers circulated by him. However, he did make the necessary qualified elector’s affidavit to two nomination papers not circulated by him, Nos. 880 and 879 (indictments Nos. 545 and 569), and he could not remember who had circulated them, yet he swore to the affidavit on each that the signers had signed with full knowledge of the contents.
 

 Week Defendants Convicted of Perjury on the Uncorroborated Testimony of One Witness?
 

 The rule is well established in this Commonwealth that upon a charge of perjury it is unnecessary for the prosecution to make out a case by the testimony of
 
 two
 
 witnesses; all that is required is the direct testimony of one witness and “strong circumstances conducing to that end”
 
 (Steinman v. McWilliams,
 
 6 Pa. 170, 177), or “corroborative evidence”
 
 (Com. v. DeCost,
 
 35 Pa. Superior Ct. 88, 95;
 
 Com. v. Rogo,
 
 71 Pa. Superior Ct. 109;
 
 Com. v. Haines,
 
 130 Pa. Superior Ct. 196, 196 A. 621). or “substantial corroborating circumstances”
 
 (Com. v. Bobanic,
 
 62 Pa. Superior Ct. 40, 45), or “any material circumstance ...... proved by other witnesses in confirmation”
 
 (Williams v. Com.,
 
 91 Pa. 493, 501). Professor Wigmore in his work on Evidence, (3d Edition) Vol. VII, section 2042, states, “(2) As to the
 
 nature of the corroboration
 
 no detailed rule seems to have been laid down, nor .ought to be laid down. The jury should be instructed not to convict unless the testimony of the principal witness has been so corroborated that they believe it to be true beyond a reasonable doubt”. See,
 
 Com. v. Bobanic,
 
 supra. Professor Wigmore also states in the same section, “(3) The rule of course applies only to the proof of the
 
 fact alleged
 
 
 *320
 

 as falsely sworn,
 
 and therefore a corroboration as to the
 
 aet of swearing
 
 and the words sworn is not called for. Moreover, the corroboration is required for the perjured fact as a whole, and not to every detail or constituent part of it." The proof of the
 
 act of swearing
 
 was sustained by the admission in evidence of the affidavits themselves, with the certificates of the notaries, (Aet of January 2,1815, P. L. 3, 6 Sm. L. 238), the testimony of the notaries who were able to identify the individual defendants as the affiants, and proof by handwriting experts of the signatures of such affiants as the notaries were unable or unwilling to identify personally. These, in addition to proof that the affidavits were signed by persons bearing the names of the respective appellants (See
 
 Com. v. Cover,
 
 281 Pa. 429, 434, 126 A. 786), were sufficient proofs of the act of swearing to go to the jury as to all the defendants; and Frazier, Burkhart and Filner admitted signing and swearing to the affidavits alleged to have been sworn to by them.
 

 With respect to proof of the
 
 fact alleged as falsely sworn,
 
 the case of
 
 Williams v. Com.,
 
 91 Pa. 493, supports the position that evidence of a misrepresentation as to the contents of a nomination paper to signer A. by the person circulating the paper, is not corroborated by proof that a similar misrepresentation was made by him at a different time to signer B. In that case a sheriff was charged with perjury in his oath of office, to-wit, he swore he had not paid money or other valuable thing to secure his election, whereas it was charged he had paid money to different people for that purpose. A number of witnesses swore the defendant had paid them for their vote and influence. The conviction was set aside by the Supreme Court, holding that the proper application of the perjury rule requires that the jury “should have been clearly instructed that proof of a corrupt act by one witness was not corroborative evidence of another [act] which was proved by a different witness". This was followed by this Court in
 
 *321
 

 Com. v. Haines,
 
 130 Pa. Superior Ct. 196, 200, 196 A. 621.
 

 But the court below was of opinion that there was sufficient evidence of corroborating circumstances to bring the case within the rule that to support a conviction of
 
 perjury
 
 there must be the evidence of one witness and corroborating circumstances. .
 

 Furthermore, the court pointed out in its opinion refusing motions for a new trial and in arrest of judgment that the false representations made to signers were made in the presence of another person or persons, who also testified to the fact, — and thus corroborated the signer as to the
 
 falsity of the statement
 
 — as respects
 
 all the indictments for perjury on which sentence was imposed,
 
 except the following:
 

 Com. v. Lloyd Brown,
 
 No. 596 June Sessions, 1940.
 

 Com. v. Samuel O. Frishman,
 
 No. 564 June Sessions, 1940.
 

 Com. v. Charles Gwynn,
 
 No. 602 June Sessions, 1940.
 

 Com. v. Mack McCullough,
 
 No. 576 June Sessions, 1940.
 

 Com. v. Antun Skvaric,
 
 No. 513 June Sessions, 1940.
 

 Com. v. Michael Stanovich,
 
 No. 504 June Sessions, 1940.
 

 Com. v. William Thornton,
 
 No. 508 June Sessions, 1940.
 

 Our review of the evidence is in accord with this statement, except that we would add to the list,
 
 Com. v. John Derkacs,
 
 No. 537 June Sessions, 1940 and
 
 Com. v. Max Jenkins,
 
 No. 574 June Sessions, 1940. The court added: “The evidence is clearly sufficient to sustain the conviction upon the second count of the indictment, which is a violation of section 951(d) of the Election Code. In this charge there is no requirement of two witnesses or one witness and corroborating circumstances.”
 

 The learned court, however, overlooked that the maximum imprisonment that may be imposed for a conviction on that count is one year. As Charles Gwynn was
 
 *322
 
 sentenced to two years’ imprisonment, his sentence on No. 602 June Sessions, 1940 will be reduced to one year’s imprisonment in the Allegheny County Workhouse, to run concurrently with the sentence imposed on him on the conspiracy indictment, No. 519 June Sessions, 1940.
 

 The Conduct oe the Teial Judge
 

 Appellants contend that they were prejudiced by the conduct of the trial judge in examining certain Commonwealth’s witnesses who testified on the trial contrary to their evidence before the grand jury.
 

 Nearly 900 witnesses were called and examined for the Commonwealth. As to seven of them, the district attorney, averring surprise at the answers of the witness, asked to be allowed to cross-examine him as to whether he had not testified differently before the grand jury. These witnesses were Theodore Book (pp. 570-578), Luther A. Glenn (pp. 777-781), Wenzel Svovoda (pp. 1761-1774), Jean Mackey (pp. 3033-3037), Anthony Mackey (pp. 3037-3046), Willis Collins (pp. 3241-3247), and Mark Suminec (pp. 3532-3538). As to three of these witnesses, Book, Svovoda and Suminec, after they had testified that they had appeared as witnesses before the grand jury and that their answers to the questions propounded to them had been the opposite of what they had just sworn to on the trial, the court interrogated them, evidently for the purpose of calling their attention to the fact that their testimony amounted to an admission that they 'had committed perjury in testifying before the grand jury — e.g. p. 572 (Theodore Book) : “The Court: You understand, you are admitting you committed perjury? You understand that? A. Yes.” On objection by defendants’ counsel, that the court was intimidating the witness, the court said: “We are not intimidating the witness. We are seeking to have the witness tell the truth......This Court will not sit idly by and hear a witness state bluntly, admit that he committed perjury. Let that be understood.” Again,
 
 *323
 
 after Svovoda bad bluntly admitted that be bad sworn differently before tbe grand jury and that bis testimony before tbe grand jury was not true, tbe court called bis attention to tbe seriousness of this testimony and tbe fact that it amounted to an admission of perjury. Tbe transcript of tbe testimony shows that tbe court asked the witness, (p. 1762) : “Do you understand that you are committing perjury here? Do you understand tbe offense? You are sitting here and deliberately committing perjury. Do you understand that?” The rest of tbe colloquy leads us to think that the stenographer misunderstood tbe court and used tbe word ‘committing’ for ‘admitting’, for tbe colloquy, as a whole, leaves no other meaning; tbe ruling of tbe court (p. 1769) on defendants’ motion to withdraw a juror, was: “We will refuse tbe motion and state here if any witness wants to change bis or her testimony they have a right to do it. Of course if they want to change it and admit they committed perjury they can do that but tbe consequences that would follow on that will be something again because this court simply cannot allow such things as this to go on without notice.”
 

 So, when Suminec was called to tbe witness stand, his testimony, that he knew that Exhibit 19 (petition 152) was a petition for nominees of the Communist Party, was directly contrary to what he bad sworn before tbe grand jury. His lengthy examination by the district attorney was most evasive and unsatisfactory, as be continually shifted bis testimony. The court then asked him, “As I understand it, you admit that you lied before tbe Grand Jury because you were afraid of losing your job, is that right?” And after several shifting and contradictory answers from tbe witness, ordered him to be held.
 

 We are of opinion that no substantial rights of tbe defendants were prejudiced by tbe court’s action. It is the right, if not the duty, of the trial judge when a witness before him admits having committed perjury,
 
 *324
 
 or his testimony on the trial is at direct variance to what he testified to a few months before, to call his attention to the legal consequences of his testimony, warn him of the seriousness of his course, and order him to be held on a charge of perjury if in the light of this knowledge he persists. The court in this case, had previously upheld the right of a witness to refuse to answer on the ground that it might incriminate him; but if the witness refuses or neglects to avail himself of it, notwithstanding counsel for the defense had suggested it, and testifies to the exact opposite of his prior testimony, the court does not err in calling his attention to the effect of his testimony and holding him on a charge of perjury if he persists in it. An admission of perjury by a witness should be followed by a holding over on that charge.
 

 The Bule in Civil Cases Not Applicable
 

 Counsel for appellants ask: “Can a signer of a nomination paper, who reads English and who has full opportunity of examination thereof, which paper on its face clearly shows its nature, purpose, and party for which it is circulated, be heard to say he had no knowledge of the contents thereof?” And they evidently rely on decisions which hold that such conduct prevents the party so signing from presenting it as a defense in a civil action. Passing by the fact that many of those who signed the nomination papers were illiterate and had small ability to read and write English, and that the papers when presented to them did not show the first page, which contained the heading, the principle is not applied in criminal prosecutions :
 
 Com. v. Henry, 22
 
 Pa. 253, 256;
 
 Com. v. KoEune,
 
 69 Pa. Superior Ct. 176, 181;
 
 Com. v. Conroy & Kline,
 
 109 Pa. Superior Ct. 274, 280, 167 A. 407;
 
 Ashland Towson Corp. v. Kasunic,
 
 110 Pa. Superior Ct. 496, 502, 168 A. 502. It is not a valid defense in a prosecution for crime that common prudence was not used in avoiding imposition or that the person deceived by the defendants’ representations
 
 *325
 
 did not read the paper before signing it:
 
 Com. v. Conroy &
 
 Kline, supra, p. 280.
 

 Conspiracy
 

 We come then to the conspiracy charge, and the only question remaining to be considered on the appeals from the convictions for conspiracy — in addition to those already discussed under the perjury appeals — is whether there was sufficient evidence in the record to justify a finding by the jury of the unlawful combination of the defendants and their criminal intent in so combining. In this connection we repeat what we said in
 
 Com. v. Kirk et al.,
 
 141 Pa. Superior Ct. 123, 138, 14 A. 2d 914: “If the combination is formed for the purpose of committing a crime — as distinguished from an act merely illegal — , if there be a direct intention that a crime should be committed, whether it be a crime at common law or by statute, the corrupt motive or criminal intent is necessarily present, for there can be no innocent motive in a combination entered into to commit a crime.”
 

 The appellants do not criticize the trial judge’s instruction to the jury defining the crime of conspiracy, and they have no just cause for so doing, as he very carefully and clearly explained the essential elements constituting that offense. Their complaint is that the evidence produced was insufficient to warrant their conviction of the crime charged. We will not here attempt any further analysis or review of the testimony, although we have carefully read it. It is true, as appellants assert, that the Commonwealth produced no direct evidence of an express or formal agreement with a specific criminal intent. In many cases that would be a very difficult duty, and it is not required if the subsequent unlawful acts of the defendants and the attending circumstances that are proved justify the inference of a prior corrupt agreement.
 

 As stated in
 
 Com. v.
 
 Strantz, supra, 328 Pa. 33, 43, 195 A. 75: “The heart of every conspiracy is a common understanding, no matter how it comes into being.”
 
 *326
 
 This court in Com.
 
 v. Jermyn et al.,
 
 101 Pa. Superior Ct. 455, 465, speaking through Judge Gawthrop, said: “The joint assent of minds required to sustain a charge of conspiracy may he inferred from facts which establish ......that the conspiracy had been formed.” At common law a criminal conspiracy is an agreement between two or more persons with criminal intent to do an unlawful act or to do a lawful act by unlawful means. It will be observed that the gist of the offense is an agreement with an illegal purpose.
 

 A portion of the proof upon which the Commonwealth relied was direct evidence. It showed that the defendant Frazier and other representatives of the Communist Party obtained blank election petitions and took them to the party’s headquarters in Pittsburgh where Frazier distributed them to other defendants herein. The appellants do not deny this evidence or question that the purpose in distributing the petitions was an agreement to obtain signatures thereto.
 

 Most of the evidence, however, was circumstantial. The Commonwealth did not rely on, or attempt to prove, an express agreement as to the method that was to be used to obtain signatures. It contends that the acts and conduct of the defendants and attending circumstances clearly and convincingly establish by reasonable inference the existence of a corrupt mutual undertaking amounting to a criminal conspiracy. The trial judge, in that part of his charge dealing with circumstantial evidence, followed with care the rule laid down by the Supreme Court in
 
 Com. v. Benz,
 
 318 Pa. 465, 472, 178 A. 390;
 
 Com. v. Bardolph, 326
 
 Pa. 513, 531, 192 A. 916; and
 
 Com. v. Giovanetti,
 
 341 Pa. 345, 359, 19 A. 2d 119. We might add that in the main he concurred in the legal positions taken by the defendants as he affirmed fifteen of their eighteen points submitted, and only a general exception was taken by them to the charge.
 

 The nomination papers were handled generally by
 
 *327
 
 two persons wlio obtained signatures thereto by making false and fraudulent statements that the petition was for the purpose of keeping America out of war, endorsing President Eoosevelt for a third term, for more relief, obtaining better living conditions for colored people, etc. See supra. Of course all of the statements were false and entirely foreign to the true purpose of the petition. The petition, after the signatures were obtained, was generally given to a third person who had not circulated the paper, but nevertheless made affidavit to it. In other words, the usual practice followed was to have someone, other than those who circulated the petitions, make the necessary affidavit thereto.
 

 After the signatures had been secured, the defendants, ¡all of whom made affidavits to one or more of the papers, were sworn
 
 in groups
 
 before a notary public. These papers were then returned to headquarters, bound together, and taken by a committee of which one of the defendants was a member to Harrisburg, where they were filed. The three defendants who testified admitted that they were acting together. Literally hundreds of witnesses testified to false and fraudulent representations made by the defendants and by those acting with them. The method used by all those circulating petitions to obtain signatures was so similar that it is inconceivable that the defendants’ conduct could be attributed to a coincidence rather than to a general agreement between them knowingly to make untrue and fraudulent statements as an inducement for the electors to sign the petitions, and thereafter to make false affidavits thereto.
 

 The jury in such circumstances could very properly infer that their concerted action to a common end was the result of an unlawful agreement:
 
 Com. v. Rhey et al.,
 
 140 Pa. Superior Ct. 340, 349, 14 A. 2d 192. We said in
 
 Com. v. Rosen et al.,
 
 141 Pa. Superior Ct. 272, 276, 14 A. 2d 833. “A conspiracy may be inferentially established by showing the relation, conduct, or circum
 
 *328
 
 stances of the parties, and the overt acts on the part of co-conspirators have uniformly been held competent to prove that a corrupt confederation has in fact been formed.”
 

 A review of this record convinces us that the evidence was sufficient in volume and quality to warrant a jury in finding these defendants guilty of a criminal conspiracy.
 

 We have given the matter the careful consideration which the importance of the cases, not only to the appellants but also to the Commonwealth, calls for, and are of opinion that the defendants had a fair trial, were justly convicted and that no substantial ground for reversal as to any of the appeals exists, except that the sentence of imprisonment imposed on Charles Gwynn in the perjury-false affidavit charge, indictment No. 602 June Sessions 1940, should be reduced to one year in the Allegheny County Workhouse, to run concurrently with his sentence on the conspiracy charge, No. 519 June Sessions 1940, which is not disturbed.
 

 In all other respects, the assignments of error are overruled and the several judgments are respectively affirmed. It is further ordered that as to any of the appellants who may have been released on bail, he or she shall appear in the court below at such time as the said court shall fix and be committed by that court until he (or she) has complied with the sentence, or any part of it which had not been performed at the time his (or her) appeal was made a supersedeas.
 

 [1]
 

 It appeared in the defendants’ ease that the candidates of the Communist Party had been chosen at a ‘Convention’ alleged to have been held at Philadelphia in February, 1940.
 

 [2]
 

 The certificate of a notary public is prima facie evidence of the allegations set forth in it: Act of January
 
 2,
 
 1815, P. L. 3, 6 Sm. L. 238;
 
 Zollner v. Moffitt,
 
 222 Pa. 644, 72 A. 285. By the Act of March 5, 1791, 3 Sm. L. 6, sec. 3, it is provided that any person legally convicted of having wilfully and knowingly made or taken a false oath or affirmation before any notary, in any matter within his official duty, shall suffer the pains and penalties of wilful and corrupt perjury. It was not repealed by the Criminal Codes of 1860 and 1939.