Commonwealth *v.* Hatch, Appellant.

Argued April 28, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, RHODES, HIRT and KENWORTHEY, JJ.

*Jacob Boonin,* with him *Herman A. Wecht,* for appellant.

*Abraham Berkowitz,* Assistant District Attorney, with him *John H. Maurer,* District Attorney, for appellee.

OPINION BY KELLER, P. J., July 23, 1942:

An automobile, which the appellant, Albert E. Hatch, was driving, struck and killed a man named Frederick Schreiner, sixty-eight years old, while he was crossing Frankford Avenue, from east to west, at or near Cottman Street, in the City of Philadelphia. The accident happened about 10:15 o'clock on the night of Sunday, June 1, 1941, a clear, dry night. Hatch was arrested and indicted for (1) involuntary manslaughter and (2) failing to stop and render assistance following the accident. At the trial he was acquitted of the latter charge, but was convicted of involuntary manslaughter, with a recommendation of mercy. He was given the maximum sentence of imprisonment allowed by law, three years, and a minimum of seven months.

Frankford Avenue is a much traveled highway. At its intersection with Cottman Street it runs in the general direction of northeast and southwest. But

all of the witnesses referred to it as running north and south, and we shall do the same. It is sixty-six feet wide between curbs, with sidewalks, twenty feet wide on the west side and twelve feet wide on the east side. A gas station is located at the northeast corner, the pumps being placed near the curb on Frankford Avenue. A fruit and flower stand seems to have been located there, at the sidewalk on Cottman Street. A double line of street car tracks is in the middle of Frankford Avenue, the northbound track being on the east side of the street.

Cottman Street crosses Frankford Avenue at the 7300 block. On the east side it enters Frankford Avenue at right angles. On the west side Cottman Street is deflected somewhat to the southwest and is joined on the north by Ryan Avenue, in the form of a broad V, making one wide street at the point of intersection with Frankford Avenue. Ryan Avenue enters but does not cross Frankford Avenue. From the north side of Ryan Avenue to the south side of Cottman, along Frankford Avenue, it is 116 feet. Cottman Street is forty feet wide between curbs. The width of the sidewalks on Cottman Street does not appear, except that one witness for the Commonwealth gave the width on the north side east of Frankford Avenue as twenty feet. There was one street light at the center of the intersection and another on Frankford Avenue just north of Ryan Avenue. There was also a traffic light control at the intersection, the signal light being located near the "east curb line of Frankford Avenue about the center of Cottman Street."

The guilt or innocence of the defendant depended on whether, when his car struck Schreiner, his driving was so negligent and reckless as to be unlawful in the circumstances; and this very largely rested on two matters: (1) The speed at which he was driving—whether it was so great as to amount to reckless driving in the circumstances present; and (2) where the man

who was killed was crossing the street—whether at a regular intersection crossing or at a point north of it. For while contributory negligence of the pedestrian is not a defense to such a prosecution, (*Hess v. Stiner*, 144 Pa. Superior Ct. 249, 252, 19 A. 2d 560; *Com. v. Stine*, 127 Pa. Superior Ct. 169, 171, 193 A. 344), it is a circumstance to be considered in determining the guilt of the accused, for if the death occurred because of the heedlessness of the pedestrian rather than the conduct of the driver, the latter should not be convicted. What might be reckless conduct, if the pedestrian was hit at the regular crossing, might not be reckless, if it occurred some distance beyond the crossing.

(1) Not one of the witnesses called by the Commonwealth, as disclosed by this record, saw the defendant's car before it struck Mr. Schreiner. They first saw it at the moment of impact. One of them (Fairman) was on Frankford Avenue at Teesdale Street, 160 feet north of Cottman Street, when it happened. Their testimony was based on their *approximation*, (forty miles per hour), of its speed *after* it hit the deceased, and was to some extent influenced by the fact that the car traveled from 200 to 240 feet before it was stopped. An estimate of speed, based on a momentary glimpse of a car approaching head on, has been held to be "obviously of little value," even in a civil action *(Mulheirn v. Brown*, 322 Pa. 171, 173, 185 A. 304 (STERN, J.); *Ealy v. N. Y. Central R. R.*, 333 Pa. 471, 476, 5 A. 2d 110 (BARNES, J.); *Anderson v. Perta*, 138 Pa. Superior Ct. 321, 323-4, 10 A. 2d 898 (BALDRIGE, J.). See also, *Craft v. Hines, Dir. Gen.*, 272 Pa. 499, 501, 502, 116 A. 379. Still more caution should be used in convicting a defendant in a criminal prosecution on such unreliable testimony.

The defendant's story was that as he approached Cottman Street he slowed down almost to a stop be-

cause the red light was against him, but just before he got to the intersection the light changed to green, and he went into second gear and was traveling twenty to twenty-five miles an hour, when at a point about fifty feet north of Cottman Street, he suddenly saw, about three feet ahead of him, a man in front of his car. He tried to avoid hitting him by turning sharply to his left but his right fender hit the man. By this time his own car had gotten into the south bound lane of traffic, in which automobiles were coming toward him, and as he was greatly excited by the accident, he drove the car some distance into the northbound lane before he stopped it and went back to see about the injured person. He was corroborated by several witnesses as to his going into second gear, the speed of the car, and his actions following the accident, and the bump on the right front fender of the car showed the point where it had hit the man.

In his charge to the jury the trial judge treated the testimony of the Commonwealth's witnesses, who had approximated the speed of the car at forty miles an hour after the accident, as if they had testified to that speed before the accident and had opportunity accurately to judge the speed; and apparently accepted it as true, for he said: "It is well to remember, right there, that the act of gross negligence, recklessness, rashness, total and utter disregard for the rights of others on the highway was the immediate cause of the death of the deceased" [Ninth Assignment]. The judge instructed the jury that they had the right to consider the distance the defendant traveled after the point of contact with the deceased, as indicating the rate of speed the car was being driven at the time of the accident, but did not even mention the defendant's explanation of this, although it was called to his attention. [Fifteenth Assignment].

He made no reference in his charge to the traffic signal light, which, if it was green when defendant

entered the intersection, was red for the pedestrian,— not one witness for the Commonwealth referred to it— nor to the car being in second gear as it entered the intersection—all he said on the subject was that the defendant and two of his witnesses testified he was traveling twenty or twenty-five miles an hour when the car hit the man.

(2) Only *one* witness for the Commonwealth placed the deceased at the intersection crossing when he was hit. That was Mr. Brous,—whose testimony in other respects was confused and contradictory. The rest put him thirty or more feet north of the intersection when they first saw him. Officer Thistle found pieces of broken glass, apparently from the right headlight, extending from *fifty* feet north of Cottman Street to a point eighty feet north of Cottman, where there was a fresh blood mark or pool about eight by twelve inches.

Brous testified that he was the watchman at the fruit and flower stand; that the "old gentleman came to me and passed a remark," and then said, "Good night, I am going home." He said Schreiner then walked in the street (Frankford Avenue) and was hit right at the intersection—when asked if that was a regular crossing, he said, "Yes sir, it is a wide corner." He further said, the man had got about "twelve feet in the street," "about half-way to the north car track."

Just why Mr. Schreiner should cross Frankford Avenue from east to west on his way home, no one explained. He lived at 4201 Teesdale Street. That was half a block *north* of Cottman Street and two blocks *east* of Frankford Avenue. All he had to do was to walk one-half block north on the east side of Frankford Avenue and then two blocks *east* on Teesdale Street and he would be home. It was not necessary to cross Frankford Avenue at all to get to his home. Perhaps after walking a short distance on Frankford Avenue,

he changed his mind and decided to cross the street for some purpose. Although Cottman Street was only forty feet wide between curbs on the east side, the combined distance of Cottman Street and Ryan Avenue on the west side was 116 feet. A direct walk across Frankford Avenue from the north sidewalk of Cottman Street would have landed him somewhere in this open street space of 116 feet.

The trial judge accepted the version of Brous and placed Mr. Schreiner's crossing at the regular street intersection crossing.

We feel that in his charge to the jury the trial judge unconsciously emphasized the evidence of the Commonwealth and minimized that of the defendant. Undoubtedly it was his personal opinion that the defendant was guilty of reckless driving, resulting in Mr. Schreiner's death. While we are of opinion that his charge was unconsciously biased, we probably would not reverse except for one incident on the trial which we feel was so damaging to the defendant that, taken with the court's attitude on the trial, he had not a fair chance of acquittal thereafter.

The defendant called as a witness a young man named Albert Kindziewski. He testified that he was sitting in the driver's seat of a car parked on the east side of Frankford Avenue, south of Cottman Street, with a friend, Gus Mulholland, who also was called as a witness for defendant; that there was nothing between him and Cottman Street. He observed the car defendant was driving, before it got to the intersection, for about "half the distance of Cottman Street"—that would be thirty to forty feet depending on the width of the sidewalks on Cottman Street; that when the traffic light changed to green, the car started out in second gear. He saw the collision between defendant's car and the pedestrian; that the latter was about thirty feet north of the north side of Cottman Street when he was

hit; that the car was coming about twenty-five miles an hour when it hit the man. He did not know the defendant and was first brought into the case when the latter's attorney came to see him.

On cross-examination, he said that he had not told his story to the police, nor given his name to the police officers; he had not been asked by the police for any statement, nor by the coroner. Then the following happened:

"Q. Mr. Berkowitz [Assistant District Attorney]—Did you give your name to Sergeant Thistle ......

"A. I left before they came.

"Q. Where did you go?

"A. I went back to my car. [He and Mulholland had first run up to the scene of the accident.]

"Q. Then what did you do?

"A. I went into a diner [nearby on Frankford Avenue or Cottman Street] and had something to eat.

"Q. After that awful accident you could sit down calmly and eat.

"Mr. Boonin [Counsel for defendant]—Objected to.

"The Court—Take him over there!

"Mr. Boonin—Is that a matter of record?

"The Court—Yes sir ......

"Mr. Boonin—I now ask for the withdrawal of a juror.

"The Court—Motion overruled; exception noted for defendant. ......

"Mr. Boonin—I would like to have it noted on the record that his Honor held the last witness in custody.

"The Court—I did not hold any one in custody; I told him to remain here.

"Mr. Boonin—Nevertheless your Honor has him retained in court.

"The Court—Will you please sit down!

"Mr. Boonin—If your Honor wants to be disrespectful to me—

"The Court—This Court is never disrespectful to any member of the Bar. Although sometimes—

"Mr. Boonin—I have my client to protect.

"The Court—And his interests are protected. Please don't annoy me any further."

Notwithstanding the Court's statement above, we agree with defendant's counsel that the Court had held the witness in custody. His ejaculation, "Take him over there!" was not a request to the witness to remain in the court room; it was a direction to a court attendant to take the witness and keep him "over there."

There was no valid or reasonable excuse for this order. The testimony of the witness was not incredible or improbable. It corroborated the defendant in important particulars. The witness had not been "fresh" or disrespectful. The fact that he had not hunted up the police and told them his story did not militate against its truth. Most people, in like circumstances, would keep out of it unless they were asked about it. His going into the diner following the accident was not an indication that his testimony on the trial was false. The queasiness of one's stomach is not an index of his veracity.

The action of the court could not be regarded by the jury otherwise than as a direction to give the witness's testimony no credence; and it thus deprived defendant of material corroboration.

We have upheld a court in ordering a witness held for perjury, where he admitted on the trial that he had sworn falsely on a prior occasion: *Com. v. Antico*, 146 Pa. Superior Ct. 293, 322-324, 22 A. 2d 204, 218, 219.

So too, we have refused to reverse a judgment of the court below where the trial judge called to the bar a witness for the defendant and bound him over to answer the charge of perjury, *when the peculiar circumstances of the case* were such as to justify such a course: *Com. v. Salawich*, 28 Pa. Superior Ct. 330; although

the better practice is to send the jury out while the trial judge orders the witness to be held: *Com. v. Schoenleber & Patterson,* 96 Pa. Superior Ct. 76, 81.

But it was implicit in those cases that there was reasonable ground for holding the testimony of the witness to be false and perjured. No such circumstance appears in this case. Here there was no reasonable ground for the court's action and it was most harmful to the defendant. The fifth assignment of error is sustained.

It was also error for the assistant district attorney, during his summation of the case, to state to the jury what John Arthur Mallon, a witness called by the Commonwealth, had said in his statement to the police, as to the distance the injured man had been carried by the car. The statement was not introduced into evidence and could not be. The witness had not been asked about the matter and had not testified on the subject. It was improper, and the prosecuting officer must have known it. The seventh assignment is sustained, although, by itself, we would not have held it ground for reversal.

The judgment is reversed and a new trial awarded.