## Commonwealth *v.* O'Leary, Appellant.

Argued November 20, 1950. Before HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ. (RHODES, P. J., absent).

*Samuel Goldstein*, with him *Vincent M. Casey* and *Casey, Power & Savage*, for appellant, in No. 128.

*Clyde A. Armstrong*, with him *J. Roland Johnston*, and *Thorp, Bostwick, Reed & Armstrong*, for appellant, in No. 129.

*Ralph B. Umsted,* Deputy Attorney General, with him *Loran L. Lewis,* Assistant District Attorney and *Charles J. Margiotti,* Attorney General, for appellee.

OPINION BY ROSS, J., April 10, 1951:

The appellants, A. J. O'Leary and N. P. Kann, and E. J. Kann, were indicted for wilfully subscribing, as officers, to a false annual statement of an insurance company. The case against E. J. Kann was nolle prossed, the appellants were convicted, and after motions in arrest of judgment and new trial were refused, they took separate appeals to this Court. The appeals were argued together, the issues are identical, so the appeals will be considered in one opinion.

O'Leary was vice president and controller and N. P. Kann secretary of the Keystone Mutual Casualty Company, a mutual insurance company incorporated under the laws of Pennsylvania and authorized to do business in 28 other states. In compliance with Article III, section 320 of the Act of May 17, 1921, P. L. 682 as amended, 40 PS 443, they subscribed to and filed on behalf of the company an annual statement which purported to show its financial condition as of December 31, 1946. Section 320 provides in part as follows: "For wilfully making a false annual or other statement required by law, an insurance company, association or exchange, and the persons making oath to or subscribing the same, shall severally be punished by a fine . . ." The question involved in the appeals is whether there is evidence to support the jury's finding that the appellants wilfully subscribed to a false statement of the condition of the company as of December 31, 1946.

The factual controversy centers around certain entries made in a schedule designated as "P", one of the schedules included with the blanks supplied by the

Pennsylvania Insurance Commissioner to insurance companies for the purpose of preparing the required annual statements. A function of "Schedule P" is to disclose a breakdown of the amount which is ultimately reflected as the total reserve against liability losses. Section 313 of the Act of May 17, 1921 as amended, 40 PS 112, provides a formula for computing the reserves required of stock and mutual companies and exchanges. It provides that the reserve for liability policies written during the three years immediately preceding the date as of which the statement is made, is arrived at by deducting from sixty per cent. of the earned liability premiums for each of such years, all loss and loss expense payments made under liability policies written in the corresponding years. Schedule P, under the heading "Computation of Reserve for Unpaid Liability (including Automobile) Losses December 31 of Current Year", provides space in parallel columns for entering: the result of taking sixty per cent. of the earned liability premiums; the liability loss and loss expense payments; and for entering the remainder or formula reserve. Adjoining the aforementioned columns is a column in which the company filing the schedule is to enter its own estimate of reserves for liability losses computed on a case basis. It is the greater of the resultant figures in either the formula reserve column or the company estimate column which is, for the designated year, extended to a fifth column headed "Total liability loss reserves".

The Commonwealth introduced into evidence Keystone's tabulating machine runs of the liability losses paid during the year ending December 31, 1946. These runs were admittedly used by O'Leary in the preparation of Schedule P filed with the annual statement in question. Three figures on the tabulating machine runs had lines drawn through them and other figures sub-

stituted above in ink. O'Leary admitted making these alterations. Specifically the alterations made in the runs were as follows: For the years up to 1943 the machine figure for liability losses paid was reduced by $25,000; for the year 1945 the machine figure for liability losses paid was reduced by $200,000; and for the year 1946 the machine figure for liability losses paid was *increased* by $225,000. A copy of Schedule P filed by the company with its annual statement for 1946 discloses that the *substituted* and not the machine figures were entered on that schedule. The effect of the alterations was to *increase* the formula reserves for 1943 and 1945 by $25,000 and $200,000 respectively; and to *decrease* the formula reserves for 1946 by *$225,000.* Consequently, the company's *apparent* surplus for 1946 was increased a like amount.

In addition to testifying as to the effect of the alterations, a witness, Briscoe, an accountant employed by the State of Kentucky to examine the books and records of Keystone Mutual, testified that he, upon discovering the alterations, went to the statistical department of the company and checked the monthly control runs against the yearly runs on which the changes had been made. The monthly runs agreed with the *original* and not the *substituted* figures. Casari, an insurance examiner for the Pennsylvania Department of Insurance, testified that Keystone's estimate of possible losses or claims in the policy year 1945 inserted in Schedule P was not in agreement with the company records; that the amount entered was $497,032.15, while a check of the "claim jackets" of the 1945 policies revealed that the amount should have been $778,-734.40. He also testified that the company estimates on the claim jackets of the workmen's compensation policies was $34,001.02 greater than the figure entered on Schedule P as the total reserve for unpaid compensa-

tion losses. Although his testimony was weakened some-what on cross-examination, as contended by the appellants, it was substantial and its weight was for the jury.

The Commonwealth had, of course, the burden of proving that the statement filed by the appellants was false. The appellants argue that to meet this burden the Commonwealth must present for comparison an audit, balance sheet or other comprehensive statement showing the true financial condition of the company and since it failed to produce such audit, balance sheet or other comprehensive statement there is, the appellants conclude, no evidence here that the annual statement as filed was false. We are unable to agree with this conclusion.

The manifest purpose of section 320 in its entirety is to provide the Insurance Commissioner with accurate and detailed information upon which to predicate his supervision of the business of insurance for the protection of policyholders. It cannot logically be contended that this purpose would be served by permitting insurance companies to submit annual statements based upon intuition, assumptions and approximations; yet these are the very tools with which the appellant O'Leary worked in preparing the statement in question. When asked on direct examination why he had reduced the tabulating machine run of liability losses paid in 1945 by $200,000, O'Leary answered: "To try to bring it in, as best I could, to what I thought it might be, or could be, because I didn't know where it would go." Also on direct examination he testified: "Q. Why did you make the changes in there on Schedule P that you have enumerated? First, did you make those changes? A. If I didn't make them, I ordered them made. So it is one and the same thing. Well, what should have been

done was a complete audit made. Q. Why? A. To go back and pick up those items would take a year. To have that audit made would take us four months with a good size group working on it. I had three or four days before getting it off to the printer's. This is all the time I had. So I did it that way." Further, he stated that he knew he was required to compute the reserve on a statutory basis, but "due to the conditions I found I couldn't prepare it that way." This testimony constitutes an admission that the figures inserted in Schedule P did not represent the actual losses paid by the company for the designated years. Even assuming that the substituted figures were more nearly accurate than the tabulating machine runs, and this is a doubtful assumption, they represented at best only rough approximations based upon O'Leary's belief that the machine runs did not follow the experience pattern of the company.

The appellant O'Leary argues that "wilfully" as used in the statute must be defined to include the element of bad or evil intent; and that a reading of *his* testimony discloses that he made the alterations in the machine runs in good faith and for the purpose of protecting the company and its policyholders. The decisions in this State are against this proposition. " 'Wilfully' in common parlance does not signify corruptly. To so construe it would be to give it a meaning far beyond its usual connotation. Webster's Dictionary defines it as 'self-determined; voluntary; intentional.' This is its natural meaning. It is used to distinguish an intentional act from an involuntary one. This is the import it has received in the decisions of this state." *Com. v. Hubbs (No. 2),* 137 Pa. Superior Ct. 244, 250, 8 A. 2d 618. In construing statutes such as the present one which denounce acts not in themselves wrong, the decisions of the United States Supreme Court are

in agreement with the view expressed in the *Hubbs* case. *U. S. v. Illinois Central R. Co.,* 303 U. S. 239, 58 S. Ct. 533, 82 L. Ed. 773. We think that the word "wilfully" was used by the Legislature in section 320 to avoid the possibility of imposing penalties on an insurance company, association or exchange—or officer thereof—whose annual statement is inadvertently false.

That O'Leary, who prepared the statement, had knowledge of its falsity is too clear to require discussion. With regard to Kann, the Commonwealth relies on the following testimony to prove that he subscribed to the statement knowing it to be false: O'Leary, after stating on cross-examination that he was aware that the reserve for liability losses was required to be computed on the formula as well as on the case basis, and admitting that he had failed to do so, was asked: "Q. Did you tell Mr. Kann? A. I told him I was having trouble. Q. Did you tell him you changed the figures? A. I told him as near as I could. Q. Did you tell him which figures you changed? A. I told him as near as I could which figures. Q. Did you tell him exactly what you did? A. No. I gave him the figures and he accepted them. Q. Did you tell him the exact figures? A. No." Kann admitted that O'Leary had informed him that he was having difficulty with the statistical runs. Kann takes the position that the evidence does no more than indicate that O'Leary had informed him that he was having some difficulty with the data furnished him for the preparation of the annual statement, but Kann is minimizing the information he received. In addition to telling him that he was "having trouble"; O'Leary told him "as near as" he could that figures had been changed and "as near as" he could which figures. It is a permissible inference that a man, who by his own admission was "born" in the insurance busi-

ness, recognized the significance of the information he was given.

Furthermore, assuming arguendo that Kann had no knowledge that the statement was false, he is in the position of having accepted as true a false financial statement; he has by subscribing to the same assumed to have knowledge when he had no knowledge whatever. An analogous situation arose and was decided by this Court in *Com. v. Antico,* 146 Pa. Superior Ct. 293, 22 A. 2d 204, which involved a prosecution for perjury and for knowingly making false statements in an affidavit required to be appended to and to accompany a nomination paper by the election laws of the Commonwealth. The question was whether one who makes oath to the truth of statements contained in an affidavit required by law, of which he assumes to have knowledge, when he has no knowledge whatever, can be found guilty of wilful and corrupt perjury or making a false affidavit when the falsity of the statement thus sworn to by him is proved. In answering this question in the affirmative we said at pages 317, 318: "On this, the law of this State is clear. As early as 1814, it was held in the case of Com. v. Cornish, 6 Binney 249, (TILGHMAN, C. J. ), that one who swears wilfully and deliberately to a matter of which he has no knowledge, and which is false, is guilty of perjury. This ruling has been approved in Brooks v. Olmstead, 17 Pa. 24, 29; and Page v. Allen, 58 Pa. 338, 352; and followed in Com. v. McCue, 46 Pa. Superior Ct. 416, 419 (PORTER, J.), and Com. v. Shields, 50 Pa. Superior Ct. 1, 15 (RICE, P.J.). Nor was the affiant relieved of the charge because the notary public, instead of swearing him in the words of the affidavit, may have put it in the form, 'You swear that the facts set forth in this affidavit are true *to the best of your knowledge and belief.'* See Com. v. Shields, supra, p. 14. The law placed the duty of

making this affidavit on some one who was sufficiently familiar with the facts connected with the obtaining of the signatures to be able to swear that those who signed the paper did so with full knowledge of its contents; and if one having no knowledge of the facts, recklessly assumes to swear to the truth of what is proved to have been false, he is guilty of wilful and corrupt perjury."

The evidence in this case is technical and complicated. However, from our careful examination of it, we are convinced that it will sustain the verdicts of guilty.

Judgments affirmed.