William J. Sheppard, Insurance Commissioner of The Commonwealth of Pennsylvania, *v.* Penn State Mutual Insurance Company, Evan C. Stineman, Sr., Evan C. Stineman, Jr. and Harry A. Fornwalt, Appellants.

Argued March 4, 1975, before President Judge BOW-MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Robert J. Demer,* with him *Thomas R. Balaban* and *Shaffer, Calkins & Balaban,* for appellants.

*James D. Keeney,* Assistant Attorney General, with him *Andrew F. Giffin,* Acting Chief Counsel, for appellee.

OPINION BY JUDGE CRUMLISH, JR., May 28, 1975:

Before us is an appeal from an adjudication and order of the Commonwealth of Pennsylvania, Department of Insurance (Department) made pursuant to Sections 308, 314 and 320 of the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended,* 40 P.S. §§429, 437, 443 and Section 639 of the Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, *as amended,* 40 P.S. §279, which required Penn State Mutual Insurance Company (Penn State) to pay a penalty of $3,540.00 ($10.00 per day) for failure to file an annual statement in violation of Section 320 of the Insurance Company Law, and which removed Evan C. Stineman, Sr., Evan C. Stineman, Jr., and Harry A. Fornwalt as officers and directors of any insurance company authorized to do business in the Commonwealth. The order also revoked the insurance agent's licenses of Appellant Evan C. Stineman, Jr.

Separate citations and notices of hearing were issued by Department to each of the four Appellants. The four matters were consolidated for the purpose of public hearing held in Harrisburg, May 22-23, 1973. Following Department's order, each of the three officers and Penn State appealed to this Court and simultaneously petitioned

for supersedeas. Department filed a motion to quash the petition for supersedeas. On September 20, 1974, Judge BLATT granted a supersedeas. Following Department's petition for reconsideration of the grant of the supersedeas and a hearing, Judge BLATT reaffirmed the grant of supersedeas. The merits of the appeal are now before us.

Appellants raise four arguments for our disposition:

1) Does the Insurance Commissioner have authority under Section 320 of the Insurance Company Law of 1921, 40 P.S. §443, to impose forfeitures through an administrative hearing?

2) Where an insurance company timely files its annual statement pursuant to Section 320, 40 P.S. §443, but such statement contains inaccuracies which are corrected in futuro, can the Insurance Commissioner determine this to be an invalid filing in light of the inaccuracies?

3) Can the Insurance Commissioner, on the basis of a violation of Section 320, 40 P.S. §443, remove officers and directors pursuant to Sections 308 and 314, 40 P.S. §§429, 437 and revoke an insurance agent's license under Section 638, 40 P.S. §279?

4) Is there substantial evidence to support the adjudication of the Insurance Commissioner?

After careful and extensive consideration of the voluminous record in this case, we hold that Department action of removal of officers and license revocations was justified, but can find no basis for the imposition of the monetary forfeiture.

## I. *Penn State Forfeiture*

The cornerstone about which the forfeiture determination turns is Section 320, 40 P.S. §443. That section states:

"Every stock and mutual insurance company, association, and exchange, doing business in this Commonwealth, shall annually, on or before the first day of March, file in the office of the Insurance Commissioner a statement which shall exhibit its financial

condition on the thirty-first day of December of the previous year, and its business of that year and shall, within thirty days after requested by the Insurance Commissioner, render such additional statement or statements concerning its affairs and financial condition as the Insurance Commissioner may, in his discretion, require. The Insurance Commissioner shall furnish to each of the insurance companies, associations, and exchanges blanks, in such form as he may adopt, for their statement; and he may make such changes, from time to time, in the form of the same as shall seem to him best adapted to elicit from them a true exhibit of their financial condition. Insurance companies of foreign governments, doing business in this Commonwealth, shall be required to return only the business done in the United States, and the assets held by and for them within the United States for the protection of policyholders therein.

"Any company, association, or exchange, which neglects to make and file its annual statement, or other statements that may be required, in the form or within the time herein provided shall forfeit a sum not to exceed one hundred dollars ($100) for each day during which such neglect continues, and, upon notice by the commissioner, its authority to do new business shall cease while such default continues.

"For wilfully making a false annual or other statement required by law, an insurance company, association or exchange, and the persons making oath to or subscribing the same, shall severally be punished by a fine of not less than five hundred dollars ($500) nor more than five thousand dollars ($5,000). A person who wilfully makes oath to such false statement shall be guilty of perjury."

A simple reading of this section makes it apparent that the Legislature sought to achieve four basic objectives by this enactment. First, a date for filing the annual

statement is established. That date is March 1 of each year. Second, the annual statement is to be reflective of the company's financial position as of the preceding December 31. Third, the section imposes a forfeiture on "any company, association, or exchange, which fails to file an annual statement." The forfeited sum is not to exceed $100.00 per day for each day the company is delinquent. Fourth, and finally, Section 320 allows for a fine of not less than $500.00 nor more than $5,000.00 to be imposed upon any insurance company, association, exchange or person who wilfully makes a false statement by making oath to or subscribing same. The section also permits perjury to be found against one wilfully making oath to such false statement.

Penn State was ordered by Department to pay, as a penalty for failure to file its annual statement in the form required, the amount of $3,540.00 representing $10.00 per day for 354 days computed over the period March 1, 1972, the required filing date, to February 16, 1973. Penn State argues that since it filed, be it an inaccurate filing, within the time prescribed, i.e., March 1, that there has been no failure to file within the meaning of Section 320. The first relevant portion of the section states "[a]ny company . . . which neglects to make and file its annual statement . . . *in the form or within the time herein provided* shall forfeit a sum not to exceed one hundred dollars ($100) for each day during which such neglect continues." (Emphasis added.) We read this legislative pronouncement to be directed exclusively toward late filings or filings undertaken upon exchange blanks of unapproved form. This language does not attempt to control inaccurate financial data contained in a statement executed upon proper forms and filed in a timely fashion.

It could be argued that the forfeiture imposed was premised on the second portion of Section 320 imposing penalties but such an assertion is unfounded. That portion of the section reads, "[f]or wilfully making a false annual

or other statement required by law, an insurance company, association or exchange, and the persons making oath to or subscribing same, shall severally be punished by a fine of not less than five hundred dollars ($500) nor more than five thousand dollars ($5,000)." The penalty imposed did in fact fall within these limits ($3,540.00), but Department apparently relied on the forfeiture provision of the section in that the penalty was measured "per day" as opposed to by a lump sum amount. Further, the second penalty provision providing for a lump sum penalty, is the provision directed to false and inaccurate filings, and has been held to constitute a criminal penalty and enforceable by ordinary criminal procedures. *Commonwealth v. O'Leary*, 168 Pa. Superior Ct. 569, 79 A.2d 789 (1951).

Since Department has relied on the imposition of a forfeiture for *neglect* to file in proper form, and since we find that there was no untimely filing and no unapproved form used in that filing, we cannot sustain the forfeiture.

## II.  *Removal of Officers and Directors*

Section 314 of the Insurance Company Law, 40 P.S. §437, after discussing election and powers of various officers of the insurance companies states:

"Any person chosen, either annually or to fill a vacancy, as president, secretary, treasurer, or for any other office provided for in the bylaws, shall continue to serve in such office *unless the insurance commissioner,* after such investigation as he deems proper, *shall determine that the responsibility, character, and general fitness for the business of such individual are not such as to command the confidence of the public, and to warrant the belief that the business of the company will be honestly and efficiently conducted in accordance with the intent and purpose of this act.* Any adjudication by the insurance commissioner pur-

suant to this section shall be subject to the provisions of the 'Administrative Agency Law'. . . ." (Emphasis added.) (Citations omitted.)

Section 308 of the Insurance Company Law, 40 P.S. §429 states in relevant part:

"Any stockholder or member elected to the post of director or trustee shall continue in office unless the insurance commissioner, after such investigation as he deems proper, *shall determine that the responsibility, character, and general fitness for the business of such individual, are not such as to command the confidence of the public and to warrant the belief that the business of the company will be honestly and efficiently conducted in accordance with the intent and purpose of this act. . . ."* (Emphasis added.)

Harry A. Fornwalt, Evan C. Stineman, Sr., Evan C. Stineman, Jr. were removed as officers and directors of Penn State and any other insurance company authorized to do business in the Commonwealth pursuant to these two sections. These Appellants argue that alleged violations of Section 320, which in this instance are the making of an oath or subscribing to a false statement, should not *ipso facto* mean that these officers and directors are unfit to continue in office. In effect, they argue that there is nothing in the wording of Section 320 which makes officers be absolute and unconditional guarantors of the complete accuracy of all annual statements.

Prior to seeing whether these Appellants' conduct warrants removal under Section 308 and 314, it is necessary to see just what errors and inaccuracies were present in the statement. Department's long, extensive and well-written adjudication contains the necessary information as follows :[1]

---

1. The accuracy of these computations will be more clearly scrutinized in that section of this opinion dealing with substantial evidence.

*Summary of Errors in the 1971*
*Penn State Annual Statement*

## ASSETS

| | REPORTED | ACTUAL | NET OVER-STATEMENT |
|---|---|---|---|
| Agent's Balances | $2,223,395.39 | $1,448,879.11 | $ 774,516.28 |
| Mortgage Loans | 39,349.04 | 12,427.34 | 26,921.70 |
| Cash and Bank Deposits | 593,983.49 | 591,885.49 | 2,098.00 |
| Stock of Financial Fire & Cas. Co. | 885,625.00 | 482,325.00 | 403,300.00 |
| | | | $1,206,835.98 |
| Less Adjustment (Finding of Fact 15(b)) | | | −301,150.85 |
| Adjusted Total | | | $ 905,685.85 |

## LIABILITIES

| | REPORTED | ACTUAL | NET UNDER-STATEMENT |
|---|---|---|---|
| Other Expenses | $ 52,572.00 | $ 105,114.00 | $ 52,542.00 |
| Taxes, Licenses & Fees | zero | 3,420.00 | 3,420.00 |
| FAIR PLAN | zero | 16,749.26 | 16,749.26 |
| Unauthorized Reinsurance Reserve | zero | 158,419.80 | 158,419.80 |
| Drafts Payable | 143,649.38 | 184,992.19 | 41,342.81 |
| Total | | | $ 272,473.87 |

## POLICYHOLDERS' SURPLUS

| | REPORTED | ACTUAL | NET OVER-STATEMENT |
|---|---|---|---|
| | $ 520,456.53 | ($657,703.19) | $1,178,159.72 |

The standard by which the conduct of officers and directors is measured is "whether the responsibility, character and general fitness for the business of such individual are not such as to command the confidence of the public and to warrant the belief that the business of the company will be honestly and efficiently conducted in accordance with the intent and purpose of this act."

We look first to the conduct of Harry A. Fornwalt as secretary of Penn State. On February 18, 1972, Fornwalt signed the annual statement subscribing and swearing to the following affidavit:

"... president ... secretary ... treasurer ... of the (company) being duly sworn, each for himself deposes and says that they are the above described officers of the said insured, and that on the thirty-first day of December last, all of the herein described assets were the absolute property of the insurer, free and clear from any liens or claims thereon, except as herein stated, and that this annual statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to are a full and true statement of the assets and liabilities of the condition and affairs of the said insurer as of the thirty-first day of December last, and of its income and deductions therefrom for the year ended on that date, according to the best of their information, knowledge and belief, respectively."

He testified that it was his understanding that a certified public accountant had reviewed the statement, but without even reading or inquiring as to the contents signed the affidavit.

It is not Department's position that Fornwalt knowingly or wilfully subscribed. Rather, the adjudication found such a high degree of gross neglect as to justify questioning Fornwalt's ability and fitness to conduct the business efficiently.

Appellant argues that Section 320 violation should not be the basis for removal pursuant to Sections 308 and 314. It is true that the conduct of subscribing to a false statement is punishable under Section 320 by monetary penalty or perjury, but such conduct may have independent significance as it relates to the removal sections. We hold that subscribing to a false statement, where the record shows the subscription to have resulted

from gross neglect is such conduct as to warrant the Insurance Commissioner's removal of an officer or director. The fact that such conduct could also result in a monetary penalty is of no significance in the determination that the officer or director cannot command the confidence of the public and lacks the general fitness to conduct the business efficiently.

Viewing the conduct of Evan C. Stineman, Jr., we likewise conclude that the removal was justified. He also swore to the affidavit previously set out in determining Fornwalt's culpability. But, in addition, Evan C. Stineman, Jr. was chief operating officer of the company, and occupying such a unique position, had reason to be completely familiar with the financial operating position at the time the statement was filed. A total review of the record reveals that his relationship with other companies financially intermingled with Penn State by way of having loaned money, etc., gave Evan C. Stineman, Jr., a unique ability to ascertain where Penn State stood financially as of December 31. For these reasons, we would also affirm his removal.

As to the removal of Evan C. Stineman, Sr., a stipulation has been entered that his role was similar to that of Fornwalt and as such, his fate must be the same.

III. *Revocation of Insurance Agents License*

Department's order also revoked all insurance agents licenses presently held by Evan C. Stineman, Jr. pursuant to Section 639 of the Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, 40 P.S. §279 which provides in relevant part:

"Upon satisfactory evidence of the violation of any of the provisions of sections six hundred four, six hundred six, six hundred seven, six hundred twenty-three, six hundred thirty-one, six hundred thirty-two, six hundred thirty-three, six hundred thirty-three point one, six hundred thirty-four, six hundred thirty-five, six hundred thirty-six, six hundred thirty-seven,

and six hundred thirty-eight of this act, by any agent or solicitor of any insurance company, association, or exchange, or by any insurance broker or excess insurance broker, or upon satisfactory evidence of such conduct as would disqualify such agent or broker or excess broker from initial issuance of a license under sections six hundred three, six hundred twenty-two and six hundred twenty-four, the Insurance Commissioner may, in his discretion, pursue any one or more of the following courses of action:

"(1) Suspend or revoke or refuse to renew the license of such offending party or parties;

"(2) Impose a penalty of not more than one thousand dollars for each and every act in violation of any of said sections by said party or parties."

Conclusion of law number four states, "[r]espondent Evan C. Stineman, Jr. by making and signing the 1971 Penn State Annual Statement has engaged in conduct such as would disqualify a person from initial issuance of an insurance agent's license under Section 603 and within the meaning of Section 639 of the Insurance Department Act of 1921, supra." Section 603, 40 P.S. §223, is one of the enumerated sections in Section 639 which, if violated, could result in revocation.

In *Insurance Department v. Sneyd,* 88 D & C 97 (Dauph. C.P. 1953) an agent who failed to note an encumbrance on a change of car endorsement had his license revoked. Surely subscribing to an inaccurate annual statement must likewise constitute conduct that would disqualify a person from initial issuance of a license under Section 603, and therefore, serve as a basis for revocation pursuant to Section 639.

We find no error in Department's revocation pursuant to Section 639.

### IV. *Substantial Evidence*

Appellant's final argument is that Department's adjudication is not supported by substantial evidence. We

disagree. In an unusually exhaustive set of findings of fact, Department has set out the events underlying this appeal. We have examined each finding and subfinding and find substantial evidence to support them all.

For a complete understanding of the inaccuracies of the statement which underlie this case, a review of the findings is appropriate.

"1. Respondent Penn State Mutual Insurance Company (Respondent Company)· is a domestic mutual insurance company doing the business of insurance within the Commonwealth of Pennsylvania.

"2. Respondent Evan C. Stineman, Sr., is President of Respondent Penn State Mutual Insurance Company and a director thereof.

"3. Respondent Evan C. Stineman, Jr. is a Vice-President of Respondent Penn State Mutual Insurance Company and a director thereof. He is the chief operating officer of the company. He is also a licensed insurance agent.

"4. Respondent Harry A. Fornwalt was the Secretary of Respondent Penn State Mutual Insurance Company on December 31, 1971 and on February 28, 1972.

4a. Each of the Respondents received proper notice of the hearing in this proceeding.

"5. The 1971 Annual Statement of Respondent Penn State Mutual Insurance Company (hereafter, 1971 Penn State Annual Statement) was filed with the Pennsylvania Insurance Department on February 29, 1972 on behalf of Respondent Penn State Mutual Insurance Company, and was signed and sworn to by each of the three individual Respondents on February 28, 1972.

"6. *Agent's Balances (Asset) Amount In Issue $774,516.28.*

a. The 1971 Penn State Annual Statement reported 'Agent's Balances' as an asset of the company valued at $2,223,395.39.

b. $774,516.28 of this amount represented a net overstatement of the total net admitted assets of re-

spondent company consisting, in part, of the following:

1. $127,584.24 was based upon a non-existent reinsurance treaty with Continental Casualty Company.

2. $110,133.48 represented a net overstatement of receivables due from Grocers Mutual Insurance Company.

3. $74,725.61 represented a net overstatement of receivables due from Patrons Mutual Insurance Company.

4. $87,137.12 represented a net overstatement of receivables due from Angelica Mutual Insurance Company.

5. The remaining net overstatement consisted of agents' balances.

"7. *Mortgage Loans (Asset) Amount in Issue $26,921.70*

a. The 1971 Penn State Annual Statement listed three 'Mortgage Loans' among the assets of the company, and stated their total value at $39,349.04.

b. As of December 31, 1971, $26,921.70 of the total reported figure represented an unsecured loan to Respondent Evan C. Stineman, Sr.

c. The unsecured loan represented an overstatement of the 'mortgage loans' asset in the amount of $26,921.70.

"8. *Stock (Asset) Amount in Issue $403,300.00*

a. The 1971 Penn State Annual Statement stated the value of Respondent Company's 'stock', an asset, to be $1,017,200.00.

b. On Schedule D of the 1971 Penn State Annual Statement the securities making up the total amount reported by Respondent company were listed individually. They consisted entirely of shares owned in three companies: Penn Traffic, 2,100 shares ($61,-425.00) ; United States National Bank, 1,800 shares

($49,500.00) ; and Financial Fire and Casualty Company, 272,500 shares ($885,625.00).

c. Financial Fire and Casualty Company (Financial Fire) was controlled by and affiliated with Insurance and Realty Counselors (IRC) and Penn State Mutual Insurance Company since: (1) IRC held 70.2% of the shares of Financial Fire (2) Penn State held 20% of the shares of Financial Fire (3) a majority of the directors of Financial Fire (Harvey Stineman and Respondents Evan C. Stineman, Jr. and Evan C. Stineman, Sr.) were also directors of Penn State Mutual (4) Two of the directors of Financial Fire (Respondent Evan C. Stineman, Jr. and Harvey Stineman) together owned 98% of the outstanding shares of IRC (5) IRC owned $202,409.53 of the '809 certificates' (contributions to surplus of a mutual insurance company made in accordance with the provisions of Section 809 of The Insurance Company Law of 1921) and Respondent Evan C. Stineman, Jr. owned an additional $38,090.47 out of a total of $250,500 outstanding '809 certificates' issued by Penn State Mutual.

d. The Financial Fire shares were reported in the 1971 Penn State Annual Statement at the over-the-counter (OTC) bid price as reflected in standard 'pink sheet' records of the National Daily Quotation Service. This price was $3.25 per share.

e. The Annual Statements of insurers authorized to do business in Pennsylvania required the insurers to obtain valuations of securities in accordance with National Association of Insurance Commissioners (NAIC) determination procedures for reporting purposes.

f. The established procedures for determining valuations of common stocks of subsidiary, controlled or affiliated companies require that acquisitions of such stocks be reported within thirty days and that

information relevant to valuation be provided to the Subcommittee on Valuation of Securities of the NAIC.

g. The acquisition of the Financial Fire shares by Respondent Company was not reported within thirty days to the Subcommittee on Valuation of Securities of the NAIC, nor was information relevant to this valuation provided to the subcommittee.

h. According to NAIC procedures, because it was an affiliate of Penn State Mutual, the shares of Financial Fire Casualty Company could only have been properly valued at either no more than book value or no more than 'cost plus profit' valuation.

i. Book value of Financial Fire at December 31, 1971 was $1.77 per share.

j. At December 31, 1971, 'cost plus profit' was no higher than book value.

k. The highest possible allowable valuation of these shares was $1.77 per share, or $482,325. This amount is $403,300 less than that reported by Respondent Company. However, because the acquisition of these shares was not reported to the NAIC, whether the exact proper valuation of these shares should be even lower cannot be determined.

"9. *Cash and Bank Deposits (asset)—Amount in Issue $2,098.00.*

a. The 1971 Penn State Annual Statement listed cash and bank deposits, an asset of the company, at $593,983.49.

b. In 1970, Respondent Company opened a special bank account for the purpose of refunding certain overcharged premiums to its policyholders. Respondent Company's procedure in handling this account was to write checks for refunds to policyholders without making any notation as to the amount or to whom they were written. As the checks cleared the bank, they were then entered in the cash disbursement ledger, and deposits were made in the bank accounts to cover the checks.

c. The Commissioner takes notice that normal accounting procedure is to note the amount of each check or draft at the time it is written.

d. At the end of 1971, accounting for all the checks outstanding, the account was overdrawn by the amount of $2,078 and therefore the item of 'Cash and Bank Deposits' was overstated by $2,098.00 as of December 31, 1971.

"10. *Other Expenses (liability)—Amount in Issue $52,542.00.*

a. The 1971 Penn State Annual Statement reported 'Other Expenses', a liability of the company, at $52,572.00.

b. This liability represented a reserve for the payment of certain underwriting expenses which were unpaid at year end.

c. On January 13, 1972, Respondent Company made a cash disbursement in the amount of $105,-114.00 for expenses incurred in 1971 by a check to Insurance and Realty Counselors, Inc., endorsed 'pro rata of expenses for 1971' signed by Respondent Evan C. Stineman, Jr.

d. This disbursement was made prior to the filing of the 1971 Penn State Annual Statement by Respondent Company and the entire amount of $105,114.00 should have been included in the 'Other Expenses' category.

e. Respondent Company's liability for 'Other Expenses at December 31, 1971 was actually at least $105,114. This liability was therefore understated by $52,542.00.

"11. *Taxes, Licenses and Fees (liability)—Amount in Issue $3,420.*

a. The 1971 Penn State Annual Statement reported 'Taxes, Licenses and Fees' liability at zero.

b. At the end of 1971, Respondent Company had premium taxes due and payable to the Commonwealth of Pennsylvania in the amount of $3,420.

c. A liability for 'Taxes, Licenses & Fees' should have been recorded in at least the amount of $3,420.

"12. *Fair Plan (liability)—Amount in Issue $16,749.26.*

a. The 1971 Penn State Annual Statement did not report any liability to the Pennsylvania FAIR Plan.

b. Respondent Company had a liability to the Pennsylvania FAIR Plan in the amount of $16,749.26 as of December 31, 1971.

c. On February 28, 1972, the individual respondents did not know the exact amount of the liability of the Respondent Company to the Pennsylvania FAIR Plan, but they did know or should have known that there was a liability in some amount and could have made a reasonable estimate of the amount by obtaining the necessary information from the FAIR Plan Offices.

"13. *Unauthorized Reinsurance Reserve (liability)—Amount in Issue $158,419.80.*

a. The 1971 Penn State Annual Statement reported its liability for 'Unauthorized Reinsurance Reserve' as 'none'.

b. Of the 24 insurance companies to whom Respondent Company had ceded reinsurance as of the end of 1971, two were neither authorized to do business in Pennsylvania nor covered by any fronting arrangements. These were Constitution Reinsurance Corporation and Rockland Mutual Insurance Company.

c. At the end of 1971, Respondent Company had net unauthorized reinsurance in the amount of $94,413.95 with Rockland Mutual and a net amount of $64,005.85 with Constitution Reinsurance Corporation.

d. An amount of $158,419.80 should have been reserved for the reinsurance with these two unauthorized companies.

"14. *Drafts Payable (liability)—Amount in Issue $41,342.81*.

a. The 1971 Penn State Annual Statement reported 'Drafts Payable', a liability of the company, at $143,649.38.

b. The records of the Respondent Company showed that drafts payable on December 31, 1971 were actually $184,992.19, or an additional liability of $41,342.81.

"15. *Surplus as Regards Policyholders—Amount in Issue $1,178,159.72*.

a. The 1971 Penn State Annual Statement reported 'Surplus as Regards Policyholders' in the amount of $520,456.53.

b. The net decrease in surplus as regards policyholders included $301,150.13 in increases offsetting the foregoing items. This adjustment represents the difference between the foregoing items and the net decrease of $1,178,159.72.

c. Summary of Errors in the 1971 Penn State Annual Statement [is listed earlier in this opinion].

d. *POLICYHOLDERS' SURPLUS*

| REPORTED | ACTUAL | NET OVERSTATEMENT |
|---|---|---|
| $520,456.53 | ($657,703.19) | $1,178,159.72 |

e. At December 31, 1971, Respondent Company was required by Section 202 of The Insurance Company Law of 1921 to maintain a surplus of $500,000 in order to meet the minimum financial requirements of the Commonwealth with respect to the lines of insurance which it was authorized to write.

f. The officers of Respondent Company continued to operate the Company despite its failure to meet the minimum financial requirements.

g. Subsequent to December 31, 1971, Respondent Company's financial condition improved rapidly, due largely to the fact that no new business was written

after that date and Respondent Company was therefore gradually relieved of the necessity to maintain certain reserve liabilities. This improvement in condition was apparent on the face of the 3-31-72 and 6-31-72 quarterly statements filed with the Insurance Department.

h. By March 31, 1973, just prior to this hearing, the Respondent Company's surplus as regards policyholders was reported to be approximately $700,000 with most of the questionable assets being eliminated and most of the liabilities taken into account."

Consistent with the foregoing, we

### ORDER

.AND NOW, this 28th day of May, 1975, upon consideration of the record, the order of the Insurance Commissioner is reversed insofar as it relates to the imposition of a money forfeiture upon Penn State Mutual Insurance Company pursuant to Section 320 of the Insurance Company Law of 1921, 40 P.S. §443, and is affirmed so far as it relates to removal from office and revocation of license of the following:

1. Harry A. Fornwalt is hereby permanently removed from each and every position he presently holds as an officer or director of any insurance company authorized to do business in Pennsylvania; and

2. Evan C. Stineman, Jr., is hereby removed as an officer and director of Penn State Mutual Insurance Company and any position as an officer or director of any insurance company authorized to do business in Pennsylvania.

3. Evan C. Stineman, Sr., is hereby removed as an officer and director of Penn State Mutual Insurance Company and any positions as officer or director of any insurance company authorized to do business in Pennsylvania.

4. All insurance agents licenses held by Evan C. Stineman, Jr. are hereby revoked.

---

CONCURRING AND DISSENTING OPINION BY JUDGE MENCER:

I concur with the majority's opinion except as to Part III, dealing with the revocation of the insurance agent's license held by Evan C. Stineman. I would set aside the Department's revocation of Mr. Stineman's license upon the reasoning of *Wallace v. Commonwealth of Pennsylvania, Insurance Department*, 18 Pa. Commonwealth Ct. 267, 334 A.2d 830 (1975).